Everett Lyle THOMAS, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 20388, 20650.

United States Court of Appeals Ninth Circuit.

July 8, 1966.

Jack I. Podret, Tucson, Ariz., for appellant.

William P. Copple, U. S. Atty., Jo Ann D. Diamos, Asst. U. S. Atty., John Augustine, Asst. U. S. Atty., Tucson, Ariz., for appellee.

Before BARNES and BROWNING, Circuit Judges, and THOMPSON, District Judge.

BARNES, Circuit Judge:

On January 14, 1965 appellant Thomas was indicted, together with four other defendants (Ortega, Tona, Mrs. Ortega and Miss Bock) on one count of violating Section 174 of Title 21 United States Code, to-wit: receiving, concealing, and facilitating the transportation and concealment, of 13.7 grams of heroin.[1] The heroin was discovered in a search of an automobile on November 30, 1964, of which appellant Thomas was the owner and driver. The search was incident to an arrest made when the auto was stopped between eight and nine miles north of the Mexican border.[2] The auto and the defendants had come across the border from Mexico the previous day.

Prior to the trial, and on January 15, 1965, defendant Tona pleaded guilty to the lesser charge (failure to register as a narcotic user) and was dismissed as a defendant from this case.

Defendants Thomas and Bock moved to suppress the seized heroin, alleging an illegal search and seizure in that the searching officers did not have probable cause to believe the defendants had or were about to commit a felony.

The government resisted the motion, urging probable cause existed for the search (19 U.S.C. § 482). The trial judge upheld the government's position that probable cause existed. This was alleged as error, both on the first motion for new trial, and on this appeal.

We find no merit in this contention. Appellant relies heavily on the *Cervantes* case (Cervantes v. United States, 263 F. 2d 800 (9th Cir. 1959) and 278 F.2d 350 (9th Cir. 1960)), but the government correctly points out that in *Cervantes* there was no personal observation by the government officers following the receipt of the informer's information—while here there was, i. e., the observation of the meetings with the two taxicab drivers and the numerous border crossings. As the trial court carefully pointed out, there were seven factors involved, which we number as follows:

"THE COURT: The Court finds [1] that on the basis of the information supplied to Mr. Aros by the informant, [2] whom the Court also finds was a reliable informant, [3] on the basis of the testimony regarding the movements of the parties involved in the vehicle, [4] their motel arrangements, [5] on the basis of the arrival of the cabs from across the Line on the night or early morning of November 30th, [6] on the basis of the identification of Tona as a person addicted, the Court finds that the agents had a reasonable ground to believe [7] when the car was moving out of Nogales and away from Nogales on the morning of November 30th that there was being conveyed or transported in the vehicle narcotics, and therefore the stopping of the vehicle and searching of the vehicle was a reasonable search and not an unlawful search. Accordingly, the Motion to Suppress is denied." (R.T., Vol. II, L 8–22.)

■ We therefore hold there was probable cause for the search—i. e., "a reasonable cause to suspect there was merchandise which was imported contrary to law" within the auto.

---

1. Tona was charged on the same day in a separate indictment with failing to register as a narcotic addict when crossing the Border.

2. RT 223.

Prior to the start of trial, on March 17, 1965, the government, in the presence of the jury, dismissed the indictment as to the two female defendants. This is charged as error.

Thus defendants Thomas and Ortega alone went to trial.

Tona, an admitted addict, testified Ortega wanted him (Tona) to obtain narcotics. Tona "believed" Thomas took part in this conversation.[3]

Tona testified both Thomas and Ortega bought heroin, but that Thomas' bundle alone was that discovered in the search of the auto. Tona admitted on cross-examination that he had been promised a chance to plead to a lesser sentence if he would testify against the other defendants.[4]

At the end of the government's case, the trial court ordered a judgment of acquittal as to Ortega.

Thomas, the sole remaining defendant, was convicted by the jury. Although the evidence is close and sometimes conflicting, and with much of it given by persons known to be addicted to narcotics, there exists sufficient evidence, looking at the issues most favorable to the government's position (as we must on appeal after a jury's conviction) to uphold the defendant Thomas' conviction.

We must note there are before us two appeals.[5] The second appeal being from the denial of a second motion for new trial, made on the basis of newly discovered evidence, i. e., the asserted recantation by the defendant Ortega of his testimony given at the trial; his "new" testimony that it was *his* heroin that was discovered in the search of the Thomas auto. The court denied the motion for a new trial, characterizing Ortega as "an evasive and perjurious witness."

---

3. "I am not quite sure, I don't remember very clearly." (RT 33)

4. "Q. What plea did you enter?
"A. I entered not guilty.
"Q. Subsequent to that time, did you have a conversation with Mr. Aros and Mr. John Lindberg· of the United States Attorney's office about this charge?
"A. Yes, sir.
"Q. And what did ·you talk about with Mr. Aros and Mr. Lindberg?
"A. We just talked about the smuggling charge and failure to register, how much time I was to get and all that.
"Q. Did they tell you what time you would get under the smuggling charge, what time it was mandatory you would get?
"A. Right.
"Q. How long?
"A. Five years, five years minimum, mandatory five years.
"Q. After they told you that, what else did they tell you?
"A. I can't recall what else they told me.
"Q. Let me ask you, didn't they tell you if you would testify against the other four persons they would recommend to the Court that you be allowed to plead to not registering?
"A. Right, sir, after I come to think of it, yes, sir.

"Q. It was only after this that you told the story something like the story you testified to today?
"A. Right.
"Q. You had never told them a story before, had you?
"A. No, sir.
"Q. You had spoken to other people about it?
"A. I talked to my attorney, yes, sir.
"Q. You didn't tell them that story, either, did you?
"A. No, sir.
"Q. Again within the last day and a half, haven't you talked to Mr. Lindberg again?
"A. This morning I had a conversation with him but just a couple of words, that is all.
"Q. Didn't you talk about what could happen to you again?
"A. Mr. Lindberg, yes, sir, a little.
"Q. Didn't Mr. Lindberg tell you if you came in here and told this story against these other witnesses, you wouldn't be prosecuted on the smuggling charge?
"A. Yes, sir, I was.
"Q. Wasn't that what he told you this morning?
"A. Yes, sir." (RT 57, L 22 to RT 59, L 14)

5. No. 20388 and No. 20650.

■ We need not agree with the trial judge's estimate of defendant Ortega; neither do we disagree. Ortega was certainly not a convincing witness, either at the trial, or on the second motion for new trial. Suffice it to say with respect to a matter involving so largely a matter of discretion resting in the trial judge, we find no error in the trial court's ruling denying the second motion for a new trial. The denial of the motion for new trial in case Number 20650 is affirmed.

Having found there was probable cause for the search of appellant's car, that the evidence was sufficient to support appellant's conviction, and that there was no abuse of discretion in denying each motion for a new trial, we reach appellant's fourth and fifth alleged errors— the court's refusal to give the jury certain proposed instructions, defendant's numbers three and four.

It is conceded proffered instruction number three is not the law. See: Woxberg v. United States, 329 F.2d 284 (9th Cir. 1964); Kaplan v. United States, 329 F.2d 561 (9th Cir. 1964).

Appellant's Requested Instruction Number Four [6] is a proper instruction

in many cases, and particularly in those cases where circumstantial evidence alone is presented against a defendant. Its value decreases somewhat in direct ratio to the amount of direct evidence produced. Here there existed direct evidence. It would be difficult to say, as a matter of law, that the evidence against the defendant in this case was "chiefly" circumstantial.

■ The jury was carefully and properly instructed [7] on the burden of proof where the evidence before the trier of fact is capable of two interpretations, one consistent with guilt; one consistent with innocence. We think the instructions as a whole were adequate, and we find no reversible error in them.

We come to appellant's last point, which compels us to reverse. To savor the import of the prosecution's questions, we desire to quote from the record exactly what was said.

On cross-examination of defendant Thomas, the Assistant United States Attorney asked:

"Q. Did you ever tell him [8] when he asked you why you wanted nar-

---

6. Appellant's Requested Instruction Number Four:
"When the case which has been made out by the state against a defendant rests entirely or chiefly on circumstantial evidence and in any case before the jury may find a defendant guilty, basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendants' guilt must be proved beyond a reasonable doubt."

7. The court gave the following instruction:
"If the evidence in the case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant and the other to his innocence, it is your duty under the law to adopt that interpretation which will admit of the defendant's innocence and reject that which points to his guilt. You will notice that this rule applies only when both of the two possible opposing con-

clusions appear to you to be reasonable. If on the other hand one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and reject the unreasonable. Bearing in mind, however, that even if the reasonable deduction points to a defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilty." (RT 461, L 17, to 462, L 7)

8. "him" was Tona—the original defendant who had agreed to turn state's evidence in return for a guilty plea to a lesser charge and the original defendant who made the purchase of the heroin, and the only defendant with unquestioned possession of the narcotics at one time.
In this connection, the testimony of Tona is interesting: see n. 4, supra.
In a thirty-eight page statement given by Tona to the government on February

cotics you would supply sources, you had to supply or sources you had to dispose of in, say, Northern California, San Francisco, around there?" (RT 406, L 18–21.)

We assume this was an attempted foundation for impeachment by proof of a prior inconsistent statement. We assume it was not impeachment on a collateral matter, and that it was relevant. Wigmore on Evidence, 3d ed., Vol. III § 1020.

(It should be noted that although the one-time defendant Tona was examined at length and vigorously cross-examined (RT 29–149), no foundation was laid, or attempted to be laid, at that time for impeachment of Thomas by asking Tona concerning any previous statement made by Thomas.)

When this "foundation question" was asked by the prosecutor, the trial judge very properly inquired:

"Q. Does [government] counsel avow you will show if the answer is negative, you will produce testimony of that statement?

"A. MISS DIAMOS: Yes.

"Q. THE COURT: On that basis counsel may proceed." (RT 407.)

Counsel for appellant, outside the hearing of the jury, then pointed out that Exhibit 3 (the statement taken by the government from Tona) did *not* support the government's position. And the trial judge very properly stated:

"If it doesn't, the whole thing will be blown out of the water." (RT 407.)

Accepting the challenge, government counsel continued:

"Q. Then you did not reply to him [Tona] that you had sources or methods of disposal in Northern California and San Francisco?

"A. No, I didn't.

"Q. Nor did you have that type conversation ever with Tona? (sic)

"A. No.

"Q. At no time?

"A. No." (RT 409, L 5–13.)

This was an inadequate and poorly formed question. There was a variance in content between the two questions. If we concede the person was named, the time and place were not. Robinson v. United States, 144 F.2d 392 (6th Cir. 1944). McCormick, Evidence (1954), Chapter 5, §§ 36, 37; Wigmore on Evidence, 3d ed., Vol. III §§ 1017, 1029.

There was no real inconsistency between appellant's denial and the purported impeaching testimony. Wigmore, supra, § 1040.

Thus defendant Thomas was accused of having previous dealings with, and a market for, narcotics. This was use of a statement not usable as substantive evidence of the facts stated. The crime of selling (or giving away) narcotics in the past was inferred. Without proof of either a previous conviction or even a previous arrest as to such a crime, the government prosecutor offered the impeachment, for which the foundation had been allegedly so laid.

We next turn to the supposed impeachment.

8, 1965, he contradicted his trial testimony in two important particulars:

I

"Q. Going back to the two purchases of heroin, which heroin was bigger than the other, which little ball was bigger?

"A. They were about the same size."

II

"Q. Do you think the one [packet] we found in front [of the auto] belonged to Thomas?

"A. I couldn't tell you that, I don't know." (Ex. 3, p. 19, l. 17–20.)

That the dissimilarity in size of the two packets was not an inadvertent slip of the tongue made by Tona in making his statement to the government is established also:

"Q. You say Ortega paid around $250 for it?

"A. Yes.

"Q. How much did Thomas have?

"A. $100.

"Q. Wouldn't it be twice as big as the other.

"A. I don't know. The second time I sort of made a deal."

Tona was called in rebuttal, by the government, and testified:

"Q. Do you recall having a conversation with him concerning the heroin and what Mr. Thomas was going to do with it?

"A. We had a conversation, yes, ma'am.

"Q. Do you recall it?

"A. Yes, ma'am, I do.

"Q. Do you recall what Mr. Thomas said?

"A. Well, he just told me he was taking it back with him, that he had some people waiting for him up there, I don't know whether it was him or the heroin they were waiting for." (RT 428, L 14–23.)

Actually, as the government well knew, as was brought out on cross-examining Tona on this rebuttal testimony, Tona had made a statement to the government agents on February 8, 1965, which not only failed to support the question, but stated precisely the opposite. It read, in part:

"Question. Did Thomas ever tell you he was a user of heroin?

"Answer. No, he didn't.

"Question. Why did they [9] want to buy this heroin?

"Answer. I wouldn't know.

"Question. Did they ever say what they were going to do with it?

"Answer. No, they didn't.

"Question. As far as you know, you don't know why they bought it or who they bought it for?

"Answer. No, I don't." (Original Statement, Ex. 3, p. 26, l. 5–19.)

At the trial, Tona was asked:

"Were those questions asked of you under oath and did you give those answers at that time?

"A. I believe so, yes, sir.

"Q. At that time when you were being questioned about the use of the narcotics, did you tell Mr. Aros and Mr.

Gordon and Mr. Lindberg about the statement that you have just made here in court, you know what I am referring to, did you tell them?

"A. About this statement?

"Q. Yes.

"A. No, sir, I didn't." (RT 430, L 23 to 431, L 19, incl.)

Despite the existence of this statement and the knowledge by the government of the worthlessness of the alleged impeachment, the following dialogue took place immediately:

"REDIRECT EXAMINATION

"BY MISS DIAMOS:

"Q. Why?

"A. Because I wasn't—I was asked too fast the questions. I didn't have time to think of them.

"Q. Were the questions too general?

"MR. PODRET: Objection, Your Honor, leading.

"A. Too general, yes, ma'am.

"THE COURT: The question is leading.

"MISS DIAMOS: I beg the Court's pardon.

"Q. Were the questions particularized, were they taken step by step or general questions?

"A. They were just general questions.

"MISS DIAMOS: No further questions." (RT 431, L 21 to 432, L 9, incl.)

This clearly was improper. The questions were leading. They were of little value, if any. The whole procedure was inadequate impeachment; and the government should have known it.

On appeal, appellee asserts merely that:

"Appellant now contends this was not a connecting up—that the avowal [made to the trial judge] was not substantiated by the evidence. It is respectfully submitted that it is, and that counsel did not raise this at the trial

9. Referring to Ortega and Thomas.

level. See RT 432, through the end." (Appellee's Brief, p. 19.)

We cannot agree that such maneuvers of the government in a trial can be so easily explained away. No sufficient showing was made to substantiate the avowal of government counsel.

It is true appellant did not again urge specifically the objection previously urged when the government's avowal and representation was made to the trial court. Defense counsel did move for a directed verdict of acquittal; and inferentially at least, touched upon the point here involved by reference to character witnesses and their impeachment by proof of an alleged crime involving "drugs" charged but never proved against defendant Thomas.[10]

Here we have the traditional ringing of a bell that could not be unrung. It was before a jury. An impeachment was attempted to show the defendant Thomas had admitted traffic in Northern California in narcotic drugs. A more devastating blow to a defense can hardly be imagined. Motivation, previously lacking for the crime charged, is supplied. The alleged impeaching question was unskillfully and inexactly and ineptly worded. The attempt to explain and justify the asking of it borders on the puerile.

In a close case such as this, depending partly at least, if not chiefly, on circumstantial evidence—and with no proof of actual purchase or personal possession in Thomas (except from the lips of a codefendant who escaped conviction and was eager to benefit himself), we cannot say this procedural error was not prejudicial to the appellant's rights. We find here a square corner the government failed to turn.

A completely ineffectual impeachment that fails to impeach is as much a prosecution error as no attempt at impeachment whatsoever. Enriquez v. United States, 293 F.2d 788, 794 (9th Cir. 1961).

Reversed and remanded.

10. In view of our conclusion in this case, we do not reach this point urged as error. We assume the same alleged error will not occur at a second trial.