OSHMAN'S SPORTING GOODS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 77–2494.

United States Court of Appeals, Ninth Circuit.

Nov. 20, 1978.

---

Eugene A. Wright, Circuit Judge, filed concurring opinion.

Robert M. Cassel (argued), Pettit, Evers & Martin, San Francisco, Cal., for petitioner.

Elliott Moore, Christine Peterson (argued), Washington, D.C., for respondent.

Before TUTTLE,* DUNIWAY and WRIGHT, Circuit Judges.

DUNIWAY, Circuit Judge:

Oshman's Sporting Goods, Inc. (Oshman's) petitions for review of an order of the National Labor Relations Board requiring that it bargain with Teamsters Union, Local 860. The Board cross-applies for enforcement of its order. We deny the petition for review and grant the application for enforcement.

## I. FACTS

Oshman's, a large sporting-goods retailer, employs approximately 25 workers at its warehouse in Millbrae, California. These employees were not represented by any union. In early 1976, the Board granted the Teamsters' petition for an election in a unit consisting of all warehouse employees, including truck drivers and clerical workers. An election was held on March 3, 1976, which the Teamsters lost by a vote of 14 to 10.

The Teamsters filed numerous objections to the March 3 election. After investigation, the Board's Regional Director ordered a hearing on most of these objections. The hearing was never held, however, because Oshman's and the Teamsters stipulated, with the approval of the Regional Director, that the results of the election be set aside and a new election be scheduled. The second election was held on May 13, 1976. This time the Teamsters won by a vote of 14 to 8. Had three of the pro-union voters cast their ballots against the Teamsters, the outcome would have been different.

Oshman's filed timely objections to the second election. It alleged that the Teamsters had threatened employees with physical violence, had falsely stated that official government statistics showed that Oshman's was grossly underpaying its workers, had lied about Oshman's reasons for not raising wages during the weeks preceding the election, and had falsely stated that the Board had set aside the first election because of Oshman's "lies and false promises." In support of its objections, Oshman's submitted letters by the Teamsters containing the alleged misrepresentations. It also submitted the name of Martinez, an employee who, it said, could substantiate the charges of threats of physical violence.

On July 7, 1976, after investigation, the Regional Director issued a decision overruling Oshman's objections without a hearing and certifying the Teamsters as the exclusive representative of the warehouse employees. Oshman's filed with the Board timely exceptions to the Regional Director's decision, reiterating its allegations of Teamster misconduct and urging the Board to set aside the election or, alternatively, to order a hearing on the substantial factual issues which it claimed that it had raised. By telegraphic order, the Board summarily denied Oshman's request for review. To obtain review in this court, Oshman's refused to bargain with the Teamsters. The Teamsters responded by filing an unfair labor practice charge. The Board expedited the case and, on June 20, 1977, granted General Counsel's motion for summary judgment, and ordered Oshman's to bargain.

## II. ISSUES PRESENTED

Oshman's petition raises the following issues:

1.) Should the Regional Director have ordered a hearing on Oshman's objections relating to Teamster threats of physical violence?

2.) Should the Regional Director have ordered a hearing to investigate Oshman's charges that the Teamsters lied to its employees about wage rates?

3.) Should the Regional Director have held a hearing to determine how many employees received a letter in which a Teamster organizer falsely stated that the Board ordered a new election because of Oshman's "lies and false promises"?

---

* The Honorable Elbert Parr Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

■ Our role in considering this case is a limited one. Primary authority to conduct elections has been vested by Congress in the Board, which has a "wide degree of discretion" in these matters. *NLRB v. A. J. Tower Co.*, 1946, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 323. Therefore, our review is circumscribed, and Oshman's "carries a heavy burden in charging that . . . coercion prevented a fair election" *NLRB v. Sauk Valley Mfg. Co., Inc.*, 9 Cir., 1973, 486 F.2d 1127, 1130, quoting *Shoreline Enterprises of America, Inc. v. NLRB*, 5 Cir., 1959, 262 F.2d 933, 942. *See also, Natter Mfg. Corp. v. NLRB*, 9 Cir., 1978, 580 F.2d 948, 951; *NLRB v. Adrian Belt Co.*, 9 Cir., 1978, 578 F.2d 1304, 1311; *International Tel. & Tel. Corp. v. NLRB*, 9 Cir., 1961, 294 F.2d 393, 395.

Cases in which Board conducted elections are attacked come to the Board and the courts in substantial numbers. As a result, the Board has developed a considerable body of rules defining various types of conduct that will, or will not, require that an election be set aside. A recent study, however, casts considerable doubt on the validity of the Board's approach to this problem. Getman, J.G., S.B. Goldberg and J.B. Herman, *Union Representation Elections: Law and Reality*, 1976, Russell Sage Foundation, N.Y. The study first appeared in 27 Stan. L.Rev. 1465 (1975) and 28 Stan.L.Rev. 263 (1976). The study was extensive, and appears to have been carefully done. The principal conclusion is startling:

> The assumptions on which the Board regulates campaigning are not supported by the data. Contrary to the Board's assumption, the campaign plays a limited role in the employees' decision to vote for or against union representation. Similarly inaccurate is the assumption that certain types of campaigning are likely to have a coercive impact. Voting behavior in elections involving campaign tactics believed to be coercive is not significantly different from voting behavior in campaigns that conform to the Board's standard of "laboratory conditions."

Many of the Board's rules governing campaign tactics can be eliminated. Those campaign regulations that are preserved should not require the Board to make impact judgments. The data indicate that the Board has no basis on which to find that some campaign practices have a coercive impact on employees generally or on particular groups of employees. Nor can the Board determine the impact of particular campaign tactics in individual cases. Its efforts to do so on the basis of intuition or experience of Board members have been wholly unsuccessful. Board members disagree with one another as to impact; the courts disagree with the Board; and the data show no relationship between Board findings and employee perceptions of coercive behavior.

*id.* at 146–47.

> We recommend that the Board cease regulating speech and, for election purposes, nearly all conduct.

*id.* at 159.

In *Shopping Kart Food Market, Inc.*, 1977, 228 NLRB 1311, the Board has announced that it "will no longer probe into the truth or falsity of the parties' campaign statements," thus accepting, in part, the conclusions of the study.

It is tempting to us to seize upon the study and go farther than the Board did in *Shopping Kart*, holding that we will no longer sustain orders setting aside elections, or set aside orders sustaining them, in cases of threats as well as in cases of claimed misrepresentations in election campaigns. However, we resist the temptation because it is the Board, not the courts, that is presumed to be expert in this field.

## III. THREATS OF VIOLENCE

In the course of her investigation the Regional Director or her representative interviewed Martinez. We do not know what he said, and neither did the Board.[1] We do, however, know what the Regional Director said that he said. We quote her report:

---

1. Martinez' statement is part of the confidential investigatory file.

In support of this objection, the Employer presented an employee witness who stated that approximately one month prior to the second election, he was talking with other employees during their lunch hour about Petitioner [union]. He stated that he asked one of the employees what would happen if there was a strike and somebody wanted to go to work. The employee replied that nobody could go to work if there was a picket line. The witness replied that he was going to work as he had a family to support. The other employee is alleged to have then said that somebody could get hurt. The Employer's witness stated that he would still come in to work. The other employee replied that they would send someone to picket and "do our dirty work. We'll get some guys from the Mission District (an area in the city of San Francisco). Somebody could get hurt." The witness stated that the subject never came up again prior to the election. He also stated that on occasions prior to the election, two employees asked him if he didn't think that they should "push the union in," and told him that the employees should "all stick together."

The Regional Director concluded that the evidence did not support an inference that the "other employee" was an agent of the Union, and declined to attribute what he said to the Union. She also concluded that this incident did not serve to create an "atmosphere of coercion and fear of reprisal," noting that the conversation occurred a month before the election, that there were subsequent conversations free from any type of threat or pressure, and that when the discussion occurred, none of the employees knew that there would be a second election.

■■■ The essence of Oshman's attack on these conclusions is that the Regional Director did not get the full story from Martinez, and that, if she had, she would have

been required to order a hearing to determine whether Martinez's story was true. Oshman's relies on an affidavit that it obtained from Martinez on July 15, 1976, eight days after the Regional Director handed down her report.

On July 19, Oshman's filed with the Board exceptions to the Regional Director's decision, serving a copy on the Regional Director. Nowhere in this 26 page document is there any reference to the Martinez affidavit, nor is it attached as an exhibit. So far as the record before us discloses, the first time the affidavit was mentioned was in Oshman's Memorandum in opposition to the General Counsel's motion for summary judgment, to which the affidavit is an exhibit. This memorandum was dated and served March 21, 1977, in the unfair labor practice—refusal to bargain case, long after the Board denied Oshman's request for review of the Regional Director's decision on October 7, 1976. Obviously, this is much too late.

However, in its March 21, 1977 Memorandum, Oshman's asserts that its objections to the election were supported by the affidavit.[2] The same assertion is made in Oshman's reply brief before us, and was made by Oshman's counsel at oral argument before us. The Board, in its brief, says that Oshman's first offered the affidavit to the Board in support of its request for review of the Regional Director's decision.

We need not resolve this apparent conflict between counsels' undocumented representations to us and the record. Assuming that counsels' representations are correct, the presentation of the affidavit was still too late. It was never presented to the Regional Director. She was never asked, after her decision, to reconsider and hold a hearing on the contents of the affidavit.

It will not do to argue, as Oshman's does, that she could have treated its Exceptions to her decision as a request for reconsidera-

---

**2.** The Board's regulation, 29 C.F.R. § 102.69(g), permits a party who has filed exceptions to a regional director's report on objections to an election to attach to its submission to the Board, in a subsequent unfair practice proceed-

ing like this one, "copies of documents it has *timely submitted to the regional director*, and which were not included in the report or decision." (emphasis added) Thus the question here is, was the affidavit timely submitted."

tion, as the Board's Case Handling Manual, ¶ 11406, permits her to do. Mere service of a copy of the exceptions, and of the affidavit if it was served, is not enough. Oshman's cannot claim that she should have reconsidered when it never asked her to do so.

Moreover, Oshman's had an affirmative duty to present its evidence. The Manual, on which Oshman's relies, also provides, in ¶ 11392.5:

> *Duty To Furnish Evidence* : It is incumbent upon the party filing objections to do so by the close of business on the fifth working day following the close of the election, and to furnish evidence sufficient to provide a *prima facie* case in support thereof before the Region is required to investigate the objections. In addition to identifying the nature of the misconduct on which the objections are based, the party filing objections is required to submit evidence in support thereof at the time the objections are filed or *forthwith* upon request from the Regional Director. This should include a list of the witnesses and a brief description of the testimony of each. An objecting party normally should not be permitted to "piecemeal" the submission of evidence but should be required to disclose promptly all the evidence in support of his objections. Absent the *prompt* receipt of evidence, the Regional Director should overrule the objections. (Emphasis in original.)

We conclude that the Board was not required to consider the Martinez affidavit. As the Board says in its brief:

> The function of the administrative determination on objections—to provide a speedy and efficient resolution of challenges to the validity of the election— would be completely undermined if the Board permitted a witness statement taken by an impartial Board agent during the investigation, when the witness' memory was fresher, to be vitiated by a later affidavit of the same witness, covering evidence available at the time of the investigation.

The Martinez affidavit describes the occasion mentioned by the Regional Director much as her decision does. Then it describes two other occurrences, one two weeks before the election, much like the earlier occasion, and one a few days later, at a union meeting at a bowling alley. In each case, the same two employees made similar statements. In each case the statements were made to Martinez. However, Martinez does not say that he told the Regional Director or her investigator about these occasions. He does not say that anything he describes influenced his vote. He does not name any other employees who were present, or say how many were present, or whether, if other employees were present, any of them heard the threats. He does make it clear that the threats were made to him personally.

The most that can be said for the affidavit is that it is in part different from, and in part inconsistent with, what the Regional Director says that Martinez said to her or her investigator. This kind of after-decision affidavit is usually regarded by courts with considerable skepticism when presented in support of a motion for a new trial, and therefore the court in such a case has considerable discretion in ruling on the motion. *See Thomas v. United States*, 9 Cir., 1966, 363 F.2d 159, 161–62. We think that the Board, too, has considerable discretion in such a case as this, and did not abuse it here, assuming that it was required to consider the affidavit at all. As we have said, "to warrant overturning an election, employee conduct must be 'coercive and disruptive conduct or other action [which] is *so aggravated that a free expression of choice of representation is impossible.*'" (emphasis in original) *NLRB v. Aaron Brothers Corp.*, 9 Cir., 1977, 563 F.2d 409, 412.

## IV. "MISREPRESENTATIONS" CONCERNING WAGE RATES

The Board decided the case before us on June 20, 1977, while *Shopping Kart* was decided on April 8, 1977. Presumably, therefore, the *Shopping Kart* rule is applicable to this case. *See Natter Mfg. Corp. v.*

*NLRB, supra,* 580 F.2d at 950; *Shalom Nursing Home,* 1977, 230 NLRB No. 145. The Board did not expressly apply *Shopping Kart* in this case, however. It merely summarily denied review of the Regional Director's order, and in its grant of summary judgment in the unfair labor practice proceeding concluded that all issues raised by Oshman's were, or could have been, litigated in the representation proceeding. In its brief, the Board suggests that we need not pass on the *Shopping Kart* rule because the claimed misrepresentations in this case are not grounds for setting aside the election under the Board's former and more stringent standards established in *Hollywood Ceramics Co.,* 1962, 140 NLRB 221, which *Shopping Kart* overrules. We agree with the Board.

On May 5, 1976, Oshman's sent a letter to its employees in which it stated that it intended to raise wages but was prohibited by law from doing so while an election was pending. In response, Teamster organizer Aloise sent a letter to Oshman's on May 6, copies of which were distributed to the employees. The letter stated, in part, "You know full well that the law allows an employer to grant regularly scheduled wage increases any time the employer cares to. (Even during union organizing campaigns) . . . It is obvious that your company *never* intended to establish regular wage increases, because under Federal Law you certainly had the right to grant raises right along." The author went on to assert that "The United States Federal Bureau of Labor Statistics has determined that the prevailing area wage rate for warehouse personnel is the union wage rate in the area. It is as follows." Hourly wage rates for four types of warehouse labor were then specified. These rates were identified as "wage rates . . . contained in our area agreements."

On May 11, two days before the election, Oshman's distributed a responsive notice in which it announced retroactive wage increases. It stated that its new rates were lower than those cited in the Teamster letter but also said: "While every union, not just Local 860, would like to think that its

rates are the U.S. government's 'official' wage rates for the area, it is obvious that the rates are not all the same and that they can't all be right. Oshman's believes that [its] wage rates are appropriate and competitive. . . ."

■ Before the Board, Oshman's argued that the Teamsters' assertions that wages could be raised while an election was pending, and that the company never intended to raise wages, were misleading and improper. Before this court the company appears, quite wisely, to have abandoned this argument. Oshman's could, of course, have granted regularly scheduled wage increases during the pendency of the election, *NLRB v. Gruber's Super Market,* 7 Cir., 1974, 501 F.2d 697, 701.

Oshman's concentrates its fire on the Teamsters' statement that the hourly wage rates cited in Aloise's letter were rates which the government had determined to be "prevailing" in the area. These figures were not, in fact, government figures; the author of the Teamster letter lied when he said that they were. He did not lie, however, when he said that these were wages which Teamsters' members were earning in the area for comparable labor.

■ The Regional Director concluded that the Teamsters' false statement about the wage statistics was harmless. Oshman's employees were primarily interested in what wages the Teamsters could obtain for them; not in government statistics. Moreover, Oshman's had an opportunity to respond effectively and *did* respond effectively, to the misrepresentation. In its May 11 notice, the last word that the employees heard about wages, the company stated clearly and convincingly that the Teamsters' figures were not official figures, although the Teamsters wished to represent them as such. The Regional Director properly concluded that the misrepresentation about area wage rates was immaterial.

## V. MISREPRESENTATION CONCERNING SECOND ELECTION

Shortly before the election, employee Martinez received a hand-written letter, ad-

dressed to his home, from Teamster organizer Aloise. The letter stated, in part, "the reason the National Labor Relations Board granted a new election was because of the lies and false promises Oshman's told you and the other employees." This statement was a misrepresentation, as Aloise, a union organizer involved in the campaign from its inception, had reason to know. The Regional Director had ordered a new election because Oshman's and the Teamsters agreed to it. The Board never determined that Oshman's committed improprieties during the first campaign. Martinez delivered the letter to Oshman's assistant warehouse manager at 8:30 a. m. on Monday, May 10. The election was held on Thursday, May 13. Martinez did not show the letter to, or discuss its contents with, any other employee.

Had Martinez alone received the letter, there would be no problem with this issue. The Teamsters won the May 13 election by a vote of 14 to 8; Martinez's single vote, even assuming, as appears most unlikely, that he had voted for the union, could not have altered the result. The difficulty stems from the fact that Aloise told a Board investigator that he "may have sent two similar letters to other Oshman's employees." Aloise did not retain copies of the letters, and could not remember whether they contained the same statement about the reasons why the Board set aside the first election.

The Regional Director resolved the doubts concerning the other letters' existence and content, if any, in favor of the Teamsters. She took the position that Oshman's had the burden of coming forward with proof of the sending and content of the other letters and since it had not, she assumed that they did not exist. Proceeding on the premise that Martinez was the sole recipient of the letter, she noted that his vote could not have affected the election result. We need not consider whether, as Oshman's asserts, this imposed too heavy a burden upon the Employer.

■ The Regional Director also concluded that the employer had sufficient oppor-

tunity to reply before the election, either by letter to all employees, or by calling a meeting, but did not do so. The Board's summary affirmance covers this reason as well as the other, and we think that it is sufficient.

We do not agree with Oshman's argument that the misrepresentation so seriously threatened the appearance of neutrality on the part of the Board as to require us to hold that the election should be set aside. The Regional Director, after an investigation, had found that the Union's charges of promises and misrepresentations were supported by substantial material issues of fact sufficient to require a hearing. Thereafter, the parties stipulated that "[t]he objections [of the Union] raise substantial and material issues with respect to the election," and stipulated to a new election.

We do not excuse Aloise's misrepresentation. But we do agree with the Board that it was not so egregious as to require that the election be set aside, when Oshman's had a sufficient opportunity to respond to it and did not do so. Cf. *J. Ray McDermott & Co.*, 1974, 215 NLRB 570 (partisan message added to letter-like reproduction of Board telegram); *Mallory Capacitor Co.*, 1966, 161 NLRB 1510 (alteration of Board complaint); *NLRB v. John S. Barnes Corp.*, 7 Cir., 1973, 478 F.2d 1105 (partisan comment added to Board order); *Lake Odessa Machine Products, Inc. v. NLRB*, 6 Cir., 1975, 512 F.2d 762 (partisan cartoon added to lengthy quotation from Board notice). *Dubie-Clark Co.*, 1974, 209 NLRB 217, on which Oshman's most heavily relies, involved a leaflet sent to all employees, misrepresenting a Board notice as finding five very serious violations by the employer of the employees' rights. This is closer to the above cases than it is to the case before us. The same is true of the conduct involved in *Natter Mfg. Co. v. NLRB, supra*. There, the offending material was circulated on the day of the election, and it asserted that the Board had found the union guilty of five unfair labor practices. In fact, there had been a settlement agreement, which expressly disclaimed the violations. *Formco, Inc.*, 1977, 233 NLRB No. 5, is similar to *Natter* in that

the offending material was sent to all employees, not just one. It differs in that the material was sent out seven weeks before the election.

 We think that it is for the Board, not for us, to decide whether a particular misrepresentation of its decisions, orders, documents or other processes is sufficiently serious to require that an election be set aside. We conclude that it was within the Board's wide discretion to decide that what happened here did not require that the election be set aside, even if three employees, rather than one, had received the letter.

The order of the Board will be enforced. The petition to set it aside is denied.

EUGENE A. WRIGHT, Circuit Judge (concurring):

Contrary to the statement in the majority opinion, I am not tempted to hold "that we will no longer sustain orders setting aside elections, or set aside orders sustaining them, in cases of threats as well as in cases of claimed misrepresentations in election campaigns."

Despite the fact that "it is the Board, not the courts, that is presumed to be expert in this field," this court has recognized that threats of physical harm from union agents can taint if not invalidate the results of a representation election. *See, e. g., Alson Mfg. Aerospace Div. of Alson Indus., Inc. v. NLRB,* 523 F.2d 470 (9th Cir. 1975); *Sonoco Products Co. v. NLRB,* 443 F.2d 1334 (9th Cir. 1971).

To this extent, I disagree with the conclusions of the study, cited in the majority opinion, that employer and union conduct does not have a potentially coercive impact on election results. Threats such as those that occurred here may indeed intimidate employees to vote for the union.

I concur in the result because the employer failed to meet its burden of proof. As we have held recently, "to obtain a hearing on the charge of alleged Union threats and violence, the Employers had to show that the Union's misconduct interfered with free choice, for or against a bargaining repre-

sentative." *NLRB v. Spring Road Corp.,* 577 F.2d 586 (9th Cir. 1978).

The employer here failed to show that the threats to Martinez were made by a union agent and that the threats affected Martinez's vote. Had the employer established these two facts, this might be a different case.