## NATIONAL LABOR RELATIONS BOARD *v.* A. J. TOWER CO.

No. 60.   Argued November 21, 1946.—Decided December 23, 1946.

*Gerhard P. Van Arkel* argued the cause for petitioner. With him on the briefs were *Solicitor General McGrath, Assistant Solicitor General Washington, Morris P. Glushien, Ruth Weyand* and *Joseph B. Robison.*

*John T. Noonan* argued the cause for respondent. With him on the brief was *Malcolm Donald.*

MR. JUSTICE MURPHY delivered the opinion of the Court.

The issue here concerns the procedure used in elections under the National Labor Relations Act[1] in which employees choose a statutory representative for purposes of collective bargaining. Specifically, we must determine the propriety of the National Labor Relations Board's refusal to accept an employer's post-election challenge to

---

[1] 49 Stat. 449, 29 U. S. C. § 151, *et seq.*

the eligibility of a voter who participated in a consent election.

The respondent and a union entered into an agreement to conduct an election by secret ballot on May 5, 1944, under the supervision of the Board's regional director, to determine whether the employees at respondent's Roxbury plant in the unit defined in the agreement desired to be represented by the union. The agreement was approved by the regional director and provided that the election was to be held "in accordance with the National Labor Relations Act, the Board's Rules and Regulations, and the customary procedures and policies of the Board."

The agreement set forth the qualifications for participation in the election. Only those who appeared on the pay-roll on April 21, 1944, were eligible; included were those employees who did not work at the time because they were ill, or on vacation, or temporarily laid off, or in the armed forces. The respondent had the duty of furnishing the regional director with an accurate list of the eligible voters, together with a list of the ineligible employees.[2] The list of eligible voters was duly submitted on May 1, 1944.

The agreement further provided that both the union and the respondent could have observers at the polling places to assist in the handling of the election, to challenge the eligibility of voters and to verify the tally. If challenges were made and if they were determinative of the results of the election, the regional director was to investigate the challenges and issue a report thereon. All objections "to the conduct of the ballot" or "to a determination of representatives based on the results thereof" were to be filed with the regional director within five days after issuance of the "Tally of Ballots." If the regional direc-

---

[2] Among the ineligible persons were those who had quit or been discharged for cause and had not been rehired or reinstated prior to the date of the election.

tor sustained the objections, he had the power to void the results and order a new election. The determination of the regional director was to be final and binding upon any question, "including questions as to the eligibility of voters, raised by any party hereto relating in any manner to the election." Cf. Article III, §§ 10 and 12, of the Board's Rules and Regulations (Series 3, effective Nov. 26, 1943).

The balloting took place on May 5 in accordance with this agreement. After the ballots were counted, the union and the respondent signed a "Tally of Ballots," in which the regional director certified that, of the 230 valid votes counted, 116 were cast for the union and 114 against it, with one other ballot being challenged by the union.[3] Four days later, on May 9, respondent's counsel wrote the regional director that subsequent to the election "it came to the attention of the management of the Company that Mrs. Jennie A. Kane, one of the persons who voted at the election, was not at the time an employee of the Company."[4] The letter explained that Mrs. Kane was employed by respondent from March 16, 1943, through March 24, 1944, but that after the latter date she had never reported again for work and had never appeared at the plant except for purposes of voting on May 5. It

---

[3] It was unnecessary to rule on the challenged ballot since it could not affect the result of the election, even though the ballot proved to be against the union.

[4] The letter recited that "It has now come to their attention, however, that on April 28, 1944, Mrs. Kane filed with the Division of Employment Security of the Commonwealth of Massachusetts a claim for unemployment benefits stating, in connection with that claim, that she had left the employ of the A. J. Tower Company in March, 1944, and that her reason for leaving was that she 'could not continue to do heavy work of carrying bundles which was part of her job.' The Company has also learned that on the same day, April 28, 1944, Mrs. Kane visited the United States Employment Office and was placed on its list of persons available for employment."

was admitted that the respondent, "not being advised by Mrs. Kane of any intention on her part to leave their employ, assumed that she was ill and continued her among their list of employees and, therefore, did not exclude her from the list of employees they believed eligible to vote." The letter accordingly challenged Mrs. Kane's right to vote, as well as the ballot cast by her. A hearing was requested for the purpose of passing upon the one ballot challenged by the union. If that challenge were not sustained and the ballot proved to be a vote against the union, Mrs. Kane's ballot would become material to the result of the election; on that condition, the respondent requested a hearing on its challenge to Mrs. Kane's vote.

A hearing on the matters raised by this letter was held before the regional director. He subsequently made a report in which he found that respondent included Mrs. Kane's name on the list of eligible voters submitted on May 1 on the assumption that she was ill and had not quit her job; that respondent made no attempt between May 1 and May 5 to remove Mrs. Kane's name from the list, although prior to the election respondent received by mail a notice of Mrs. Kane's claim for unemployment compensation; that respondent's observers at the polls had not challenged Mrs. Kane when she voted in their presence; and that these observers certified before the ballots were counted that the election had been properly conducted. The regional director also found that the evidence was conflicting as to Mrs. Kane's actual status.[5] But he concluded that under the circumstances the respondent had

---

[5] An agent of the Board interviewed Mrs. Kane and was told by her that: "On April 28, 1944, I applied for Unemployment Compensation benefits, thinking I was entitled to such because of my illness. At no time, prior or since, have I considered myself not an employee of the A. J. Tower Co. I have never requested my release of the A. J. Tower Co. and in fact I intend to return to the Company when I have regained my strength. I did not think that my application for

waived its right to challenge her vote or to object to the election on this ground. This determination made it unnecessary for him to rule on the ballot previously challenged by the union, since it could not affect the result. He thus found that the union had received a majority of the valid votes cast and was the exclusive representative of the employees in the appropriate unit.

The respondent thereafter refused to bargain with the union in question. Upon a complaint issued by the Board, the respondent admitted its refusal but denied that the union had ever been designated by a majority of the employees in the appropriate unit. It asserted that the election of May 5 was inconclusive on the subject because if Mrs. Kane's ballot were subtracted from the union's total and if the ballot challenged by the union were opened upon overruling the challenge and proved to be against the union, the outcome of the election would be a tie vote. The Board, after the usual proceedings, held that it would not disturb the rulings of a regional director on questions arising out of a consent election "unless such rulings appear to be unsupported by substantial evidence or are arbitrary or capricious" and that no such grounds for disturbing the ruling were present in the instant case. As an alternative ground for its action, the Board held that the regional director's refusal under the circumstances to permit an attack on Mrs. Kane's status as a voter after the results

unemployment benefits would be considered a termination from the Company. . . . On May 5, 1944, when I presented myself at the election polls at the A. J. Tower Co., I considered myself an employee of the Company and therefore entitled to cast a ballot. I still consider myself an employee of the A. J. Tower Co."

But the regional director pointed out that, despite this statement, subsequent investigation confirmed the fact that Mrs. Kane advised the Division of Employment Security on April 28, 1944, that she had left her employment with the respondent in March because of the heavy work in carrying bundles. See note 4, *supra*.

of the election had been announced "is in complete accord with the established principles and policy of the Board"— which excluded post-election challenges "because of our belief that otherwise an election could be converted from a definitive resolution of preference into a protracted resolution of objections disregarded or suppressed against the contingency of an adverse result." See also *Matter of Norris, Inc.*, 63 N. L. R. B. 502, 512. The Board accordingly ordered respondent to cease and desist from its unfair labor practice and to take the affirmative action of bargaining collectively with the union. 60 N. L. R. B. 1414.

The First Circuit Court of Appeals, however, set aside the Board's order. 152 F. 2d 275. It construed the Act as making it a jurisdictional prerequisite to a determination that an employer has committed the unfair labor practice of refusing to bargain collectively that the union with which he has refused to deal should have been chosen by a majority of those voting who were in fact employees. It held that since the vote challenged by the union may have been cast against it and since Mrs. Kane was not found to have been an employee on the crucial date, there may have been a tie vote and the Board was without jurisdiction to find the respondent guilty of a violation of § 8 (5). We granted certiorari because of the importance of the matter in the administration of the Act and because of a conflict between the result below and that reached by the Sixth Circuit Court of Appeals in *Labor Board* v. *Capitol Greyhound Lines,* 140 F. 2d 754.

As we have noted before, Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees. *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31, 37; *Labor Board* v. *Waterman S. S. Co.,* 309 U. S. 206, 226; *Labor Board* v. *Falk Corp.,* 308 U. S. 453, 458. Section 9 (c) of the Act authorizes the Board to "take a secret ballot of

employees, or utilize any other suitable method to ascertain such representatives." In carrying out this task, of course, the Board must act so as to give effect to the principle of majority rule set forth in § 9 (a), a rule that "is sanctioned by our governmental practices, by business procedure, and by the whole philosophy of democratic institutions." S. Rep. No. 573, 74th Cong., 1st Sess., p. 13. It is within this democratic framework that the Board must adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently and speedily.

The principle of majority rule, however, does not foreclose practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud. Indeed, unless such adjustments are made, the democratic process may be perverted and the election may fail to reflect the will of the majority of the electorate. One of the commonest protective devices is to require that challenges to the eligibility of voters be made prior to the actual casting of ballots, so that all uncontested votes are given absolute finality. In political elections, this device often involves registration lists which are closed some time prior to election day; all challenges as to registrants must be made during the intervening period or at the polls. Thereafter it is too late. The fact that cutting off the right to challenge conceivably may result in the counting of some ineligible votes is thought to be far outweighed by the dangers attendant upon the allowance of indiscriminate challenges after the election. To permit such challenges, it is said, would invade the secrecy of the ballot, destroy the finality of the election result, invite unwarranted and dilatory claims by defeated candidates and "keep perpetually before the courts the same excitements, strifes, and animosities which characterize the hustings, and which ought, for the peace of the community, and the safety and stability of our institutions, to terminate with

the close of the polls." Cooley, Constitutional Limitations (8th ed., 1927), p. 1416.

Long experience has demonstrated the fairness and efficaciousness of the general rule that once a ballot has been cast without challenge and its identity has been lost, its validity cannot later be challenged. This rule is universally recognized as consistent with the democratic process. And it is generally followed in corporate elections. The Board's adoption of the rule in elections under the National Labor Relations Act is therefore in accord with the principles which Congress indicated should be used in securing the fair and free choice of collective bargaining representatives.

Moreover, the rule in question is one that is peculiarly appropriate to the situations confronting the Board in these elections. In an atmosphere that may be charged with animosity, post-election challenges would tempt a losing union or an employer to make undue attacks on the eligibility of voters so as to delay the finality and statutory effect of the election results. Such challenges would also extend an opportunity for the inclusion of ineligible pro-union or anti-union men on the pay-roll list in the hope that they might escape challenge before voting, thereafter giving rise to a charge that the election was void because of their ineligibility and the possibility that they had voted with the majority and were a decisive factor. The privacy of the voting process, which is of great importance in the industrial world, would frequently be destroyed by post-election challenges. And voters would often incur union or employer disfavor through their reaction to the inquiries.

We are unable to say, therefore, that the Board's prohibition of post-election challenges is without justification in law or in reason. It gives a desirable and necessary finality to elections, yet affords all interested parties a reasonable period in which to challenge the eligibility of

any voter. And an exception to the rule is recognized where the Board's agents or the parties benefiting from the Board's refusal to entertain the issue know of the voter's ineligibility and suppress the facts.[6] The Board thus appears to apply the prohibition fairly and equitably in light of the realities involved.

The reliance of the court below upon the asserted jurisdictional requirement was misplaced. It is true that it is an unfair labor practice for an employer to refuse to bargain with a union only if that union was chosen by a majority of the voting employees. But the determination of whether a majority in fact voted for the union must be made in accordance with such formal rules of procedure as the Board may find necessary to adopt in the sound exercise of its discretion. The rule prohibiting post-election challenges is one of those rules. When it is applied properly, it cannot deprive the Board of jurisdiction to find an unlawful failure to bargain collectively. That is true even where it subsequently is ascertainable that some of the votes cast were in fact ineligible and that the result of the election might have been different had the truth previously been known. The rule does not pretend to be an absolute guarantee that only those votes will be counted which are in fact eligible. It is simply a justifiable and reasonable adjustment of the democratic process.

There is no basis in the instant case for disregarding the Board's policy in this respect. The fact that the respondent may have been honestly mistaken as to the status of Mrs. Kane has no relevance whatever to the justification for the use of the policy. And nothing in the consent agreement constituted a waiver of the policy by the Board. On the contrary, the agreement expressly stated that the election was to be held in accordance with "the customary

---

[6] See *Matter of Hale,* 62 N. L. R. B. 1393; *Matter of Beggs & Cobb, Inc.,* 62 N. L. R. B. 193.

procedures and policies of the Board," which would include the policy prohibiting post-election challenges. The provision as to the filing of objections "to the conduct of the ballot" and "to a determination of representatives based on the results thereof" within five days after issuance of the "Tally of Ballots," a provision which was quite separate from that relating to challenges, obviously has no application here. Objections and challenges are two different things in electoral parlance. Objections relate to the working of the election mechanism and to the process of counting the ballots accurately and fairly. Challenges, on the other hand, concern the eligibility of prospective voters. The Board uses this clear distinction as a matter of policy and we are not free to disregard it.[7]

Neither the record in this case nor the past history of the policy against post-election challenges justifies an assumption that the interests of the anti-union employees in this election were inadequately protected. Due notice of the manner and conduct of the election was given to all employees; and, despite the lack of any affirmative provisions in the consent agreement, there was no indication that any of the employees were prohibited from examining the eligibility list or from challenging any prospective voter. Nor was there competent evidence that any anti-union employee made any objection, either before or after the election, to the procedure adopted or to the casting of any ballots.[8] Moreover, the representatives of the

[7] "The Board follows a policy of differentiating between objections to the conduct of an election and challenges [to] the eligibility of voters and it does not ordinarily permit challenges under the guise of objections after the election." *Matter of Norris, Inc.,* 63 N. L. R. B. 502, 512. Cf. *Matter of Great Lakes Steel Corporation,* 15 N. L. R. B. 510.

[8] The respondent's factory superintendent testified that an unidentified employee came to him and "objected to the vote of this Jennie Kane" several days after the election and even longer after the receipt by respondent of the notice of Mrs. Kane's unemployment compensa-

Board, as well as those of the respondent, were bound to perform their electoral functions on behalf of all employees, including those with anti-union sentiments. In the absence of any evidence that such representatives discriminated against the anti-union employees in preparing the eligibility list or in raising timely eligibility issues, we cannot say that the interests of those employees were inadequately represented.

Since we rest our decision solely on the propriety of the Board's policy against post-election challenges, it is unnecessary to discuss the effect to be given by the Board to the regional director's ruling that the respondent waived its right to challenge Mrs. Kane's vote or the effect to be given to the terms of the consent election agreement apart from the general policy.

It follows that the court below erred in refusing to enforce the Board's order in full.

*Reversed.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE JACKSON, dissenting.

If the only interests affected were the complaining employer and the victorious union, I should agree with the Court's decision. But there is a third and, as usual, a forgotten interest here—those employees who did not want to be represented by the union.

The election was held by agreement between the employer and the union which was seeking to organize the plant. The Company was to furnish a list of eligible

---

tion claim, which had been mailed to respondent before the election. This testimony was admitted merely to show "how the company became interested in the question" of Mrs. Kane's eligibility. The Board, of course, was not compelled to accept this testimony as proof of an objection to Mrs. Kane's vote by an anti-union employee or as an indication that the interests of anti-union employees may have been inadequately represented.

voters. The Company and the union were each to have observers attend, with the right to challenge the voters. The agreement did not give anti-organization employees either observers or the right to challenge. The certified result of 116 union against 114 anti-union votes was reached by not counting a ballot which the union challenged and by counting the ballot which the Company now points out was probably invalid. Mrs. Kane's vote, no matter whether valid or invalid, is thus allowed to decide the election.

It is in evidence and undisputed that, after the election an employee—presumably anti-union, from the circumstance that he was objecting—raised the question that Mrs. Kane, who was carried on the Company's eligible list because the Company believed she was absent for illness, had, in fact, left the employ of the Company with no intention to return. If that is true, she was not a qualified voter.

But because there was no challenge at the time her ballot was cast, the Court holds there can be no inquiry into its validity. Comparison with the practice at general public elections is specious, for in those elections every citizen has a right of challenge and registration lists usually are made up and available in advance. No comparable safeguards for the employees opposed to the union appear to exist here, though both the employer and the union were protected.

The Court takes the position that although every other interest has affirmative protection, there is no necessity for similar affirmative protection to the anti-union employees. Despite the fact that both of the contracting parties were careful to provide such protection for themselves, the Court assumes it is unnecessary for the third interest. The Court says that, in the absence of evidence, it will assume that such interests were adequately represented, at the same time closing the door to hearing evi-

dence as to whether those interests were prejudiced unless those who are denied affirmative representation or challenge rights should have made affirmative objection before the wrong was consummated by casting the illegal ballot. And, of course, the members of such a minority have no standing to bring their problems either to the Board or to the Court. We hear of their grievance, if at all, only through its being identical with some complaint which the employer raises.

The Court fears that to permit inquiry into the validity of Mrs. Kane's vote would "extend an opportunity for the inclusion of ineligible pro-union or anti-union men on the pay-roll list" who would be challenged after the election in the hope of voiding an unwanted result. Of course, there are opportunities for manipulation of such a list, for collusion between employer and favored groups, for fraud, and for honest mistakes.

But if the Court is concerned to keep the elections pure, why close the door to proof of such corruption or mistake when it operates against an anti-union group, because it has not been challenged by one of the parties to it: to wit, the employer? In the usual election, it may be desirable to put an end to challenges at the time when the ballots become intermingled and indistinguishable. But to justify cutting off inquiry, it should appear that all persons interested in the election have had adequate opportunity to question the ballots cast. As long as no such provision is made for employees who are opposed to organization, I would protect their rights by allowing post-election challenges on such grounds as are urged here.

Of course the protection this gives is far from satisfactory. The challenge must be initiated by the parties the Board recognizes, the employer or the union. But there will be some instances in which their interest coincides with that of the anti-union employees. On the other hand, I can scarcely think of a more perfect device for

encouraging unscrupulousness, than to invest it with finality against all inquiry either by the Board or the courts. Here half the employees are forced to accept union representation as the result of an election in which they were not allowed to protect the ballot, and those who were, failed to do so. If I really wanted to discourage fraud, collusion, and mistakes, and protect the integrity of elections and the rights of both minority and majority, I should hold that such elections can be looked into whenever irregularity appears to have affected the result.