## NATIONAL LABOR RELATIONS BOARD v. WHITINSVILLE SPINNING RING CO.

No. 4665.

United States Court of Appeals First Circuit.

Nov. 7, 1952.

Dominick L. Manoli, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Alice T. Andrews, Washington D. C., on the brief), for petitioner.

Charles C. Cabot, Boston, Mass. (Warren D. Oliver, Henry V. Atherton, and Herrick, Smith, Donald, Farley & Ketchum, all of Boston, Mass., on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The National Labor Relations Board by stipulation with the Respondent conducted an election by secret ballot to determine whether a majority of the Respondent's production, maintenance and shipping room employees wished to have United Steelworkers Union, CIO, certified by the Board as their representative for purposes of collective bargaining. At that election 82 employees were eligible to vote, 78 employees voted, 77 ballots were counted, and of these 39 were clearly for the Union and 38 were clearly against it. The sole question presented by this petition for enforcement is the validity of the one uncounted ballot which the respondent contends should be counted against the Union with the result of a tie vote and defeat for the Union.

The ballots used in the election were furnished by the Board, and were the standard printed type customarily employed in elections involving only one labor organization. On the top half of the ballot, following the full designation of the Board, appear the words "Official Secret Ballot for Employees of Whitinsville Spinning Ring Company, Whitinsville, Massachusetts." Next the purpose of the election is stated as being "to determine the collective bargaining representative, if any, for the unit in which you are employed," and immediately following this the voter is warned: "If you spoil this ballot return it to the Board Agent for a new one." The voter is then instructed in large print to "Mark an 'X' in the square of your choice" and then the question to be decided is stated as: "Do

you wish to be represented for purposes of collective bargaining by—United Steelworkers of America, CIO?" At the bottom of the ballot side by side and spaced well apart are two blank squares over one of which is printed the word "Yes," and over the other of which is printed the word "No."

On the disputed ballot a diagonal pencil line showing signs of partial erasure appears in the square under the word "Yes," and a clear penciled "X" appears in the square under the word "No."

The Respondent maintained at the time the ballots were counted, and has consistently maintained ever since, that the voter's intention to vote against representation by the Union is clearly apparent from the above marking, and that the ballot should be tallied accordingly. Its contention, however, has not received acceptance at any stage of the administrative proceedings. The Board Agent who conducted the election treated the ballot when he came upon it during the counting of ballots as a "challenged" one for the reason, he said, that he was unable to decide whether it should be counted for or against the Union. When in due course the ballot came to the attention of the Regional Director, he concluded, quite correctly we think, that strictly speaking the ballot was not properly classifiable as "challenged," but he recommended to the Board that it be treated as "void," because of the erasure upon it, and he issued a revised tally of ballots so classifying it.

The Respondent filed exceptions with the Board to the Regional Director's report, but the Board on the authority of Palmetto Cotton Mills, Inc., 63 N.L.R.B. 421 (1945), sustained the recommendation of the Regional Director, stating in its decision: "As there is an erasure in a material part of the disputed ballot, we find the ballot to be mutilated and therefore void." In consequence it certified the Union as the bargaining representative of the Respondent's employees in the bargaining unit involved. The Union thereupon requested a meeting with the Respondent for the purpose of negotiating a collective bargaining agreement covering the employees in the

unit, but the Respondent, consistent with its position, refused the Union's request, informing the Union in writing that it considered the Union's certification erroneous and therefore refused to recognize it until its right to represent the employees in the unit had been determined by the courts. The Union thereupon instituted proceedings under § 10, National Labor Relations Act, 29 U.S.C.A. § 160, which in due course resulted in the order couched in the usual remedial terms directing the Respondent to bargain collectively with the Union. This is the order which the Board asks us to enforce in the instant proceeding.

In the representation proceeding, as already appears, the Board rested its conclusion that the ballot in question was mutilated and therefore void on the authority of its earlier decision in Palmetto Cotton Mills, Inc., supra. And in its decision in the present proceeding the Board said that it could "perceive no reason for holding differently at this time," and accordingly concluded that "because of the erasure in the 'Yes' square, the ballot was clearly spoiled and mutilated." On the basis of this conclusion the Board said that it found no necessity for determining whether the ballot did or did not reveal the intent of the voter, and then it proceeded to the conclusion that the Union had at all material times been the exclusive representative of the employees in the bargaining unit involved so that as a result the Respondent's admitted refusal to bargain with the Union constituted a violation of §§ 8(a)(5) and 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1, 5). Furthermore, the Board also found that the Respondent had violated the same provisions of the Act by unilaterally granting a wage increase and other benefits to its employees.

■ The only purpose of any election, be it a political election or one conducted by the Board to determine a bargaining representative, is to discover the intent of the qualified electors to the end that effect may be given to the will of the majority. Hence, the fundamental question in counting any ballot is for whom or for what did the voter who cast the ballot intend it to be counted, subject to the qualification in a secret election that the ballot be not marked in such a way as to give evidence of voter identification or an attempt at voter identification. And the Board has wide latitude not only in choosing policies, but also in promulgating rules by which an elector's intent is to be determined. See N.L.R.B. v. A. J. Tower Co., 1946, 329 U.S. 324, at pages 330 and 331, 67 S.Ct. 324, 328, 91 L.Ed. 322, wherein, with citation of cases which we omit, the Court said:

"As we have noted before, Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees. * * * Section 9(c) of the Act [29 U.S.C.A. § 159(c)] authorizes the Board to 'Take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives.' In carrying out this task, of course, the Board must act so as to give effect to the principle of majority rule set forth in § 9(a), a rule that 'is sanctioned by our governmental practices, by business procedure, and by the whole philosophy of democratic institutions.' S.Rep.No. 573, 74th Cong., 1st Sess., p. 13. It is within this democratic framework that the Board must adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently and speedily."

We do not understand either the Respondent or the Board to question the foregoing general propositions. The Respondent's position is that the Board's action in holding the disputed ballot mutilated and therefore void solely on account of the partial erasure of the diagonal pencil mark in the "Yes" box, and in consequence completely ignoring the question of the intent of the voter, which it says is readily apparent from an inspection of the ballot itself, was arbitrary and capricious. Furthermore, the Respondent says that the Board's action not only operated to disfranchise an eligible voter in violation of ordinary democratic principles, but also

constituted a violation by the Board of the statutory mandate under which it is empowered to conduct elections.

■ Undoubtedly the Board in the exercise of the wide discretionary powers conferred upon it by Congress could within the democratic framework have adopted a rigid policy or practice of regarding all ballots marked in an unorthodox manner as mutilated and therefore void in order to avoid disputes over ballots and thus expedite counting and the determination of bargaining representatives. It has not done so, however, but instead it has adopted a more liberal policy in conformity with the view which apparently prevails in this country with respect to political elections. See Ebco Mfg. Co., 88 N.L.R.B. 983, 984 (1950), and compare the majority and dissenting opinions in Luntz Iron & Steel Co., 97 N.L.R.B. No. 142 (1951). Thus, absent markings on a ballot which "may have been deliberately made, and may have served to reveal the identity of the voter," Laconia Malleable Iron Co., 95 N.L.R.B. 161, 162 (1951), a matter often requiring nice distinctions, but one not here involved for it has not been raised or suggested, the Board has not by any means treated all ballots marked unconventionally as necessarily mutilated and therefore void. Instead, except for erasure, it has consistently counted such ballots whenever the intent of the voter was clearly apparent and there was no question of voter identification. In conformity with this policy the Board in Garod Radio Corp., 32 N.L.R.B. 1010 (1941), counted a ballot with the letters "C.I.O." written in the box under the name of a local union as a vote for that union. And in Van Raalte Co., 49 N.L.R.B. 985 (1943), it counted a ballot with the word "no" and a check mark in the "No" box as a vote in the negative. Likewise, in Marshall, Meadows & Stewart, Inc., 59 N.L.R.B. 1286 (1944), the Board counted four ballots marked as follows: one with a "No" in the negative box instead of the conventional "X"; one with an "X" and in addition a "No" beside it in the negative box; one with a triple "X" in the negative box; and one with a "Yes" in the affirmative box instead of the conventional "X,"

as three votes in the negative and one in the affirmative. Moreover, after the instant case was decided by the Board, it counted a ballot marked conventionally but with a red pencil instead of the usual black one. Luntz Iron & Steel Co., supra.

There is no suggestion by the Board that the ballot under consideration here may have been deliberately marked in a way which could reveal the identity of the voter. Nevertheless the Board, instead of following its usual practice in this situation of looking for the voter's intent, did not reach the question of intent at all, because it accorded controlling and conclusive significance to the single fact that an attempted erasure appeared on the ballot. We must confess that we can find no logical reason why the Board should single out an erasure, or an attempt at erasure, on a ballot for special treatment by considering all such ballots necessarily mutilated and therefore void. Moreover, it seems to us only fair that a voter should be apprised of such an extraordinary rule. While the statement printed on the ballot directed the voter to obtain a new ballot if he "spoiled" the original one, the word "spoiled" was in no way defined, and it is difficult for us to say that the average voter would consider a ballot "spoiled" merely because it contained a slight erasure. If departure from orthodoxy in marking ballots is to be countenanced by the Board at all, as it clearly is from the decisions cited above, then, in the absence of any question of voter identification, the problem is, as the Board has repeatedly held, to discover if possible the voter's intent. In view of this policy we feel forced to the conclusion that there is no logical reason for holding that an erasure, or an attempted one, on a ballot for that reason alone automatically mutilates a ballot and renders it void. It therefore seems to us that the ballot here under consideration ought to be counted if the intention of the voter can be determined therefrom with reasonable certainty.

Ordinarily this question of voter intention is for the Board, so in the present situation we would ordinarily remand to the Board for a determination of that question. But an inspection of photostatic reproduc-

tions of the disputed ballot and of the actual ballot itself leaves us with the firm conviction that the intention of the voter to vote "No" is so abundantly clear that we may as well say so now in the interest of terminating this proceeding without further unnecessary delay.

Certainly the "X" in the "No" box is clear and definite, and is the conventional and proper way to indicate a preference against representation by the Union. Hence the question is whether the partially erased diagonal pencil line in the "Yes" box is enough to cast serious doubt upon this intention. The trial examiner thought that it did for the reason that it could be argued "that the voter deliberately marked both boxes on the ballot to be facetious or to express his indifference to the result of the election." This argument in the face of the clear "X" in the "No" box seems to us so farfetched as to be almost fanciful, for to be facetious or to express indifference, a voter could certainly put an "X" in both boxes. It seems to us obvious that the voter must have started to mark an "X" in the "Yes" box, and then, either realizing that he had made a mistake or perhaps changing his mind, it makes no difference which, attempted to erase the mark he had made and put an "X" in the box of his real or final choice.

A decree will be entered dismissing the Board's petition.