**WELLS FARGO GUARD SERVICES, a Division of Baker Protective Services, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–2427.

United States Court of Appeals, Third Circuit.

Argued July 20, 1981.

Decided Sept. 15, 1981.

---

John F. Cannon (argued), Charles E. Wilson, Sullivan & Cromwell, New York City, for petitioner.

Anne Rolader (argued), Margery E. Lieber, Attys., N. L. R. B., Washington, D. C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before ADAMS, HUNTER and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case is before the Court on a petition filed pursuant to sections 10(e) and (f) of the National Labor Relations Act (29 U.S.C. §§ 160(e) and (f)) by Wells Fargo Guard Services, Inc. ("Wells Fargo") to review, and a cross-application of the National Labor Relations Board ("NLRB", "Board") to enforce, an order issued by the NLRB against Wells Fargo. The order directs Wells Fargo to bargain collectively with the United Security Guard Guild ("Guild"), and is based upon the Board's decision that Wells Fargo had refused to bargain with

the Guild in violation of sections 8(a)(1) and (5) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(1) and (5)).

Whether Wells Fargo committed an unfair labor practice by refusing to bargain with the Guild depends upon whether the Board's certification of the Guild as the exclusive bargaining agent of the Wells Fargo employees was correct. Wells Fargo contends that the Guild should not have been certified by the NLRB because the Guild engaged in improper conduct in the course of the campaign prior to the election won by the Guild. The NLRB rejected Wells Fargo's contentions during the certification proceedings without holding an evidentiary hearing and refused to reconsider them during the unfair labor practice hearing. We conclude that the NLRB's certification decision should not have been reached without holding an evidentiary hearing on one of the alleged pre-election improprieties. Since the Guild was not properly certified as the bargaining representative, Wells Fargo committed no unfair labor practice when it refused to bargain. Wells Fargo will be granted a hearing as set forth below, the Board's petition for enforcement will be denied, and the case will be remanded to the NLRB.

## FACTS

On December 28, 1978, the United Security Guard Guild ("Guild") filed a petition with the National Labor Relations Board requesting that the Guild be certified as the exclusive bargaining agent for the security guards employed at the Lawrenceville branch of Wells Fargo Guard Services ("Wells Fargo"). In a letter sent by the Guild to the security guards in or around November 1978, Harry J. Martin, the president of the Guild, had introduced himself and the Guild to the guards. That letter contains the following paragraph: "Inci-

dently [sic], I have heard rumors to the effect that my character is questionable and some go as far as to say that I am wanted by the Federal Bureau of Investigation. Well, they have my address and phone number if they want me." Appendix at 165. In a letter dated November 28, 1978 from Wells Fargo to its employees, Wells Fargo included the following as the opening paragraph:

As some of you may know, Harry Martin, an individual who worked for Wells Fargo as a Field Inspector in 1976, is attempting to form a union and to organize our Trenton Office employees. He is calling his union the "UNITED SECURITY GUARD GUILD". He has drawn up a constitution and bylaws under which he has had himself named President and his wife Secretary Treasurer. Martin's union does not now and never has represented any employees of any company. He has never previously organized a union and has never negotiated a union contract. To our knowledge he has no experience whatever in organizing or running a union. By his own admission, Wells Fargo is his first target.

Appendix at 167.

On January 12, 1979, a hearing was held before Louis Verrone, Esq., a Hearing Officer of the NLRB, on the question of whether the Guild was in violation of section 9(b)(3) of the National Labor Relations Act, (29 U.S.C. § 159(b)(3)) which forbids affiliations between unions which have guards as members and unions which do not.[1] At the hearing, Harry J. Martin, president of the Guild, testified that he founded the Guild in May 1978 and registered it with the Department of Labor in November 1978. Appendix at 16. At the time of the hearing, the Guild had no members, no funds, and no paid employees. Appendix at 23, 34–39.

---

1. Section 9(b)(3) provides in part as follows: [N]o labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

Wells Fargo sought to demonstrate at the hearing that the Guild was in violation of section 9(b)(3), and that certain connections between the Retail Clerks International Union (of which Harry J. Martin, a supermarket employee and president of the Guild, was a member) and the Guild constituted a forbidden affiliation.

Mr. Martin further testified that "I consider that I am the United Security Guard Guild." Appendix at 41.[2]

On January 22, 1979, the hearing officer issued a decision in which he found that the Guild was not in violation of section 9(b)(3) of the National Labor Relations Act and directed that an election be held. Wells Fargo did not appeal from that decision.

The campaign recommenced, and the Guild and Wells Fargo each stated its case in numerous pieces of campaign literature. On or about February 9, 1979, Wells Fargo wrote a letter to its employees on the character and police record of Mr. Martin. Appendix at 178–79. On or about February 12, 1979, Mr. Martin wrote the following in a letter to the guards, defending himself and his character:

> My sincere thanks to the many of you who called me on Saturday to inform me of TITKO'S [the Wells Fargo Branch Manager] latest SMEAR CAMPAIGN . . . .
>
> First of all, let me set the record straight. I've never RAPED, ROBBED A BANK, STUCK ANYONE UP, MOLESTED, PUSHED DRUGS, KILLED ANYONE OR ROBBED OLD LADIES . . . .
>
> I am not going to try to defend my mistakes of 20 YEARS AGO, but I will say this, I was not born with a silver spoon in my mouth . . . . I found out [one] thing during this [campaign] BATTLE; I am up against the best PROPAGANDISTS in the business, but the more THEY try to KNOCK ME DOWN, the more DETERMINED I AM TO FIGHT ON. They know that I can never be BOUGHT OFF, so they STOOP LOW to pick the bones of a roguish kid of 20 YEARS AGO.

Appendix at 236.

On or about February 14, 1979, Wells Fargo distributed materials to its employees which included the information that Mr. Martin, under the alias of Harry Meehan,

had pled guilty to and been sentenced to jail for felonious assault and robbery at age 18, had been sentenced to jail for auto larceny at age 20, and in 1962 at age 30 had pled guilty to charges of unlawful possession of a gun and assault and battery and been required to pay restitution to the victim. Appendix at 184–89.

A mailed-ballot election was held between February 16 and February 28, 1979. One of the pieces of campaign literature distributed by Wells Fargo at the beginning of that period was a two-page letter accompanied by a one-page sample ballot. Appendix at 104–06. The first page of the letter and the sample ballot were duplicated onto Wells Fargo letterhead, which is printed in blue and red ink. In the letter, George Titko, the branch manager, explained NLRB voting procedures and encouraged employees to vote against the Guild. The sample ballot consisted of a page of Wells Fargo letterhead in blue and red, with the sample ballot duplicated beneath the letterhead. The ballot was marked "sample" across its face, and was designated a sample ballot in printing beneath the ballot itself. Beneath the second sample ballot designation was printed the following:

THANKS FOR YOUR SUPPORT—MARK YOUR BALLOT "*NO*"!

Beneath that sentence was printed "George M. Titko, Branch Manager." The "no" box on the ballot was filled by an X which, though duplicated like the rest of the sample ballot in black ink, was irregular in shape.

The Guild lost the February 1979 election by eight votes (62 to 54, with approximately 172 eligible to vote and 120 ballots cast). On March 6, 1979, the Guild filed objections to the election, but pursued only one objection: that Wells Fargo had impermissibly distributed a facsimile ballot before the election in violation of the rule of *Allied Electric Products Inc.*, 109 NLRB 1270 (1954).

---

**2.** The other two officers of the Guild, a friend of Mr. Martin's named Pat McCullaugh and Mr. Martin's wife, had been appointed by Mr. Martin as officers so that the Guild could qualify as a bargaining agent. Letter of Mr. Martin to the security guards; appendix at 230–231.

On March 23, 1979, Arthur Eisenberg, Regional Director of the National Labor Relations Board, issued a Supplemental Decision, Order and Direction of Second Election after conducting an investigation and allowing the parties to submit evidence. In his decision, the Regional Director ruled that the distribution of the facsimile ballot rendered the election invalid under *Allied Electric*. He concluded that the distribution of the facsimile ballot had interfered with the election, particularly in light of the facts that an X had been placed in the "no" box, that the facsimiles had been mailed out on the same day as the real ballots, and that the NLRB has a history of "strict and continuing adherence" to the *Allied Electric* doctrine. The Regional Director also decided that the presence of the letterhead, the "sample" designations and the partisan message were insufficient to "neutralize" the impact of the facsimile. Appendix at 110–11. He ordered that a second election be held. The NLRB denied Wells Fargo's request for review, and the second campaign began shortly thereafter.

In early April, 1979, Mr. Martin/Meehan wrote a letter to the security guards in which he spoke as follows:

This will be my last letter to you with deep regret.

When I began this fight for higher wages, benefits and standards for you, I was under the impression that I had paid a debt to society for being an irresponsible and roguish young man. I can see now that I was under a grave misconception. . . .

I have tendered my resignation in the interest of all of you, because in order to achieve the high standards I feel you all deserve I will not remain in office to taint what I have fought so hard these many months to achieve for you.

There is something that does make me happy to tell you, and that is the news of some of the states finest and influential people who have offered their services in your behalf. They will be made known to you in the very near future. They will act as a board of trustees on a gratis basis, and I am certain that with their aid you will have a real chance for a successful future. You will also have a board comprised of fellow guards who will be acting in your interest.

\* \* \* \* \* \*

Through the publicity gained in the news media during this campaign I was fortunate to have been offered some extremely well paying positions, one of which I will eventually accept. I only regret that I should be the one to benefit from something I started in your behalf. . . .

Appendix at 195.

After Mr. Martin's resignation letter (which was signed with his own name) had been distributed, the Guild circulated a letter signed solely by the United Security Guard Guild. That letter read, in part, as follows:

We are proud and happy to announce a newer and stronger Guild since the resignation of Harry Martin, a man we will all remember and respect for his courage and sacrifice to create a more secure and prosperous future for those of you in the security field.

The board and members of the committee have allied themselves to carry on the fight for your future benefits. . . .

The National Labor Relations Board has approved a petition for a new election, based on evidence of foul play on the part of Wells Fargo. It is unfortunate that companies should resort to such tactics, but thanks to agencies such as the N.L.R.B., the rights of the little person are still protected from such unfair practices.

In the past month, many of you have confided that your failure to cast a vote was due to confusion of many issues that were distorted or clouded by a cleverly devised smear campaign leveled at Martin. Wells Fargo succeeded in their quest to confuse you, thereby escaping unionization by a narrow margin. We intend to present a more candid picture of your future and benefits. Wells Fargo officials have boasted flagrantly to all of you

that they have always defeated unionization. We are going to prove to you that they have misled you and have distorted many issues of vital importance.

Appendix at 127.[3]

Shortly after this letter was sent to the guards, and, according to the letter itself, within a week of the mailing out of official ballots, the Guild, over the signature of Harry Rouse, Secretary-Treasurer of the Guild, sent out the promised letter concerning prior unionization of Wells Fargo. The letter was accompanied by excerpts from a contract represented as being between Wells Fargo and the American Federation of Guards. Appendix at 129–131. In it, the Guild spoke as follows:

Wells Fargo has been constantly telling you that they have always defeated unionization. We are happy to say that it is not so. The enclosed excerpts of an existing contract between Wells Fargo and the American Federation of Guards will attest to their misrepresentation. The entire contents of the current contract, which has been in effect for quite some time, is to [sic] lengthy to include in this letter, but we are certain that it will express the validity of such unionization, and prove to you that fellow officers from other branches of Wells Fargo are currently enjoying better wages and benefits. . . .

\* \* \* \* \* \*

Those of you who attended the meeting on Feb. 13th were given copies of the bylaws of the Guild, and the majority have agreed that the laws were written to the common benefit of the security officer. They were outlined by a former officer who had great love and respect for his fellow workers. . . .

In a letter dated April 17, 1979, Wells Fargo set forth its version of the contract discussed by the Guild. Appendix at 133–35. Wells Fargo argued that the contract was one between Desert Patrol, Inc. and the American Federation of Guards, and that Desert Patrol was a "small separate corporation" which had already been unionized at the time of its purchase by Wells Fargo.[4] Wells Fargo also stated that the higher wage rates applied only to employees assigned to the Occidental Center, and that they had been negotiated by Wells Fargo and not by the union. The Wells Fargo letter also stated that several other benefits listed in the Guild materials as received by Desert Patrol employees were in fact not as good as the benefits received by Wells Fargo employees.

The second mailed-ballot election took place between April 17 and April 30, 1979. The Guild won the election by a vote of 67 to 59, with 165 eligible to vote and 130 votes cast—in other words, by an eight vote margin, the same margin by which it had lost the first election.

On May 2, 1979, an article appeared in The Trentonian in which Mr. Martin was quoted. He was the only person quoted for the Guild. The article characterized Mr. Martin as a "consultant" to the Guild. Appendix at 197.

Wells Fargo filed three objections to the election: that the Guild had misrepresented Wells Fargo as having engaged in foul play and unfair practices in the first election and had thereby implied that the NLRB supported the Guild (Objection 3), that the Guild had misrepresented the facts about the relationship between Wells Fargo and the American Federation of Guards and the nature of the contract achieved by the Federation (Objection 1), and that Mr. Martin had misrepresented the nature and extent of his relationship with the Guild subsequent to his purported resignation (Objection 2). Wells Fargo also argued that the misrepresentations were material.

---

3. In a letter dated April 10, 1979, Wells Fargo had sent to the employees its own version of the events which had led to the ruling that a second election must be held. Appendix at 199–200.

4. In its brief, Wells Fargo argues that Desert Patrol was purchased by Baker Industries, Wells Fargo's parent, and not by Wells Fargo. However, in its letter dated April 17, Wells Fargo implied that Wells Fargo had purchased the company of which Desert Patrol was a part.

The Regional Director conducted an investigation and afforded all parties the opportunity to submit evidence. Despite a request from Wells Fargo that he do so, he did not conduct an evidentiary hearing. *See* appendix at 442. On July 20, 1979, the Regional Director handed down his decision overruling all of Wells Fargo's objections and certifying the Guild. Appendix at 247–58.

On the question of whether the Guild had misrepresented the facts about the American Federation of Guards and Wells Fargo in California (Objection 1), the Regional Director noted that Wells Fargo had itself stated to the employees that Wells Fargo had purchased Desert Patrol's parent, that the Guild's statements about the California contract were either quotations or "adequate paraphrases," that the information about wage rates at the Occidental Center was in the form of a photocopy of the actual contract provision and indicated on its face that it only applied to employees stationed at the Center, and that "the information set forth in this material is easily subject to evaluation by the employees themselves." Appendix at 252–53. The Regional Director concluded "that there were no material misrepresentations contained in these documents which warrant setting aside the election." Appendix at 252. In the course of his discussion of the materials in question, the Regional Director referred to testimony of Henry Rouse and Harry Martin, the "former president," proffered by the Guild, concerning the date and content of the letter dealing with the California contract. If they had been called, Messrs. Martin and Rouse would have testified that the letter had been mailed to the guards on or about April 10 or 12, 1979. Appendix at 250.

On the issue of whether the Guild had tainted the second election by accusing Wells Fargo of committing unfair practices in sending out a facsimile ballot prior to the first election (Objection 3), the Regional Director ruled that the Guild's

characterization of the results of that [first] investigation and Decision, while strong in tone, does reflect the Board's earlier determination that the Employer's conduct was improper. Consequently, the characterization of "foul play" in these circumstances, does not warrant setting the election aside, particularly where the Employer had given its own account of the Board's action.

Appendix at 256; footnote omitted.

With regard to Wells Fargo's contention that Mr. Martin had misrepresented his role in the Guild after his purported resignation (Objection 2), the Regional Director took note of Wells Fargo's contention that "the character and personal background of Harry J. Martin was [*sic*] in issue during the first campaign." Appendix at 254. The Regional Director wrote as follows:

Rouse and Martin, stated that Martin resigned effective March 1, 1979, and that the letter in question was sent to all bargaining unit employees on March 31, 1979. The Petitioner also asserts that by the date of that letter, it had contacted several individuals to serve on the Board of Trustees....

It is conceded that the Petitioner did not advise the unit employees, prior to the date of the election, who would be serving on the Board of Trustees. Contrary to the assertion of the Employer that "new management of the Union was never made known to the employees" the Petitioner distributed a letter dated April 17, 1979, listing Patrick C. McCullagh [*sic*], Joseph Coculo, and Henry Rouse, as president, vice president and secretary-treasurer, respectively.

The Board has never, with respect to representation matters, adopted an affirmative requirement for a union to disclose the type of internal information that the Employer asserts should have been distributed to unit employees during the instant election campaign. Based on the above, I am unable to conclude that the statements contained in the Petitioner's letter were likely to confuse or mislead the voters as to the identity of the bargaining agent involved. I find that the fact that Petitioner did not inform

the bargaining unit employees of the names of the new trustees, contrary to its statement that it would do so, constitutes the type of practice which is subject to employee evaluation during the election campaign. Noting that what the Petitioner said about the resignation of Harry J. Martin and the establishment of the Board of Trustees was true, and the Petitioner did not have any affirmative requirement to disclose the type of information involved herein prior to the election, I find that his objection does not warrant setting aside the results of the election.

Appendix at 254–55; footnotes omitted.

Wells Fargo filed a request for review of the July 20 decision and certification which was denied by the NLRB. While the petition for review was pending, Mr. Martin, as "advisor" to the Guild, sent Wells Fargo a mailgram dated September 10, 1979 demanding that Wells Fargo send the Guild a list of guards. Appendix at 430. Wells Fargo sent copies of that mailgram to the NLRB; however, they arrived at the Board after the Board had denied Wells Fargo's petition for review and were not considered. Appendix at 432.

Wells Fargo refused to bargain with the Guild in order to obtain judicial review of the certification. On October 23, 1979, the Regional Director issued an Order Consolidating Cases, First Amended Complaint and Notice of Hearing[5] based on the refusal to bargain. Appendix at 293–298. Wells Fargo answered the complaint, raising as defenses the contentions that Harry Martin had remained in control of the Guild throughout, that he had obtained the certification of the Guild by means of representing to the contrary, and that the Guild was in violation of section 9(b)(3) of the National Labor Relations Act. Appendix at 301–03.

A hearing was held before Edwin H. Bennett, Administrative Law Judge, on November 25, 1979. Wells Fargo sought to introduce evidence going to its affirmative defenses, including a letter dated October 22, 1979, from Robert F. O'Brien, counsel for the Guild, to Mr. Volger of the NLRB which, on its bottom, contains "cc: Harry J. Martin, President." Appendix at 434; exhibit 4 to the November 26, 1980 hearing.[6] The ALJ refused to hear Wells Fargo's evidence and quashed the subpoenas issued by Wells Fargo, on the ground that the issues which Wells Fargo was seeking to litigate had already been or could have been litigated in the context of the prior representation proceedings. The ALJ reaffirmed his decision not to hear Wells Fargo's evidence in his opinion, which he issued on May 9, 1980. Appendix at 439–449. The ALJ ordered Wells Fargo to bargain with the Guild and to post a notice.

Wells Fargo filed exceptions to the decision of the ALJ and petitioned for review of his decision by the NLRB. On September 9, 1980, the Board issued an order affirming the decision of the ALJ except in one minor respect related to the notice. Wells Fargo appealed from that affirmance, and the Board cross-petitioned for enforcement.

*DISCUSSION*

Because the Board's decision that Wells Fargo was guilty of an unfair labor practice in refusing to bargain with the Guild is premised upon its certification of the second election, we must consider the validity of that certification. *Anchor Inns, Inc. v. NLRB*, 644 F.2d 292, 293 (3d Cir. 1981). The Board has " 'wide discretion' " in conducting representation elections. *Monmouth Medical Center v. NLRB*, 604 F.2d 820, 823 (3d Cir. 1979), *quoting NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946). However, where, as here, an election is close, "closer scrutiny

---

**5.** The case with which the refusal to bargain was consolidated was settled and is not at issue in this appeal.

**6.** This letter and several other documents were received into evidence by the ALJ "only for my personal convenience in writing the decision so that I have before me, in a single, contained file, the necessary proceedings for reference sake." Appendix at 347.

of objections may be required of the Board." *Id.* at 823 n.4.

The Board overruled Wells Fargo's objections to the second election without holding an evidentiary hearing. A party objecting to an election is entitled to an evidentiary hearing if its objections have raised "substantial and material .issues of fact." *Anchor Inns*, 644 F.2d at 296. If assuming all the allegations by the objecting party to be true would lead to the conclusion that the election should be set aside, then an evidentiary hearing to determine the truth of those allegations is required. *Id.* Based on this standard, we believe that Wells Fargo's contention that an evidentiary hearing should have been granted with regard to the role of Harry Martin is correct, and remand so that a hearing may be held on that subject.

## A. The Role of Harry J. Martin a/k/a Meehan (Objection 2)

The Regional Director, affirmed by the Board, overruled Wells Fargo's objections concerning the alleged continuing role of Mr. Martin in guiding the Guild. He based his ruling on the absence of an affirmative obligation that a union "disclose the type of internal information [about who controls the union] that the Employer asserts should have been distributed to unit employees during the instant election campaign." Appendix at 255; footnote omitted. In addition, after stating the Guild's assertion that the Guild had "contacted several individuals to serve on the Board of Trustees," appendix at 254, the Regional Director stated that "what the Petitioner said about the resignation of Harry J. Martin and the establishment of the Board of Trustees was true." Appendix at 255.

The Regional Director reached his decision without holding an evidentiary hearing, even though the factual question of whether or not Mr. Martin remained in control of the Guild was disputed. In his analysis of Wells Fargo's contentions, "the Regional Director substituted 'facts' gleaned from his *ex parte* investigation . . . ." *Season-All Industries, Inc. v.*

*NLRB*, 654 F.2d 932 at 939, 940 (3d Cir. 1981), *quoting Anchor Inns*, 644 F.2d at 297. He should not have done so: material concerning disputed facts gleaned from an ex parte administrative investigation cannot take the place of an analysis of whether, if true, the allegations of an objecting party would warrant setting an election aside. *See Season-All Industries, supra* at 14–15; *Anchor Inns*, 644 F.2d at 297. Here, the question of whether Harry Martin remained in control of the Guild was a "substantial and material" issue of fact. Although it may be true that a union has no general duty to disclose information about who is running it, that does not answer Wells Fargo's objection here. Wells Fargo contends that Mr. Martin was himself a campaign issue in the first election, and that his representations about his departure from the Guild were, if false, material misrepresentations which would warrant setting aside second election. We agree.

### 1. Materiality

The conclusion that Mr. Martin was himself a material campaign issue in the first campaign follows from a review of the campaign literature distributed by the Guild during the second campaign. The Guild with Harry Martin at its helm lost the first election by eight votes. Shortly after the Regional Director ordered that a second election be held, Harry Martin, in the opening salvo of the second campaign, sent his letter of resignation—his "last letter"—to the guards. His letter clearly implies that he resigned because he did not wish his past record to stand in the way of the Guild. In his letter he also implied that he was on the point of accepting a "well-paying" job elsewhere.

In an unsigned letter to the guards, the Guild, after Mr. Martin's ostensible severance of his ties with the Guild, announced that it was the stronger for Mr. Martin's resignation and that Mr. Martin would be remembered for his "courage and sacrifice." The Guild also stated that "many" of the Wells Fargo employees in the bargaining unit had failed to vote in the election be-

cause of the "cleverly devised smear campaign leveled at Martin," and that Wells Fargo had escaped being unionized because its smear campaign had succeeded. Given the Guild's assertions that the "smear campaign" led to a failure to vote on the part of many of the guards and to the Guild's losing the election, the Guild cannot be heard to argue now that Mr. Martin's presence in the Guild was not a material issue in the first campaign.[7]

Mr. Martin sought to remove himself as a campaign issue by ostensibly resigning from the Guild. If, as Wells Fargo asserts, he removed himself in form but not in substance, then he remained as a campaign issue—only none of the voters knew it. At least some of those guards who failed to vote or voted against the Guild in the first election because Mr. Martin was in control of the Guild may have voted for the Guild in the second election under the erroneous assumption that Mr. Martin had severed his ties with the Guild. Mr. Martin's title was irrelevant; his role was not.

Not only did Mr. Martin seek to remove his character from the campaign, but he also sought to remove his inexperience. In the letter in which he announced his departure from the Guild, Mr. Martin also announced that a group of influential citizens had offered their services to the Guild, and that the Guild would be governed by a board of influential people and a board of guards. In a subsequent letter to the guards, the Guild stated that the "board and members of the committee have allied themselves to carry on the fight for your future benefits." The inference follows that the board of influential citizens was in place and looking after the interests of the Guild.

## 2. Falsity

Wells Fargo contends that Mr. Martin in fact remained in control of the Guild, even after his purported resignation. In support of its contentions, Wells Fargo points to the following: that immediately after the second election, which the Guild won by eight votes, Harry Martin resurfaced as speaking for the Guild to the media; that it is difficult to determine who was running the Guild if Mr. Martin was not; and that it was Harry Martin who demanded a list of guards from Wells Fargo on September 10, 1979.[8] Wells Fargo also cites the October 22, 1979 letter written by Robert O'Brien, counsel for the Guild, to the NLRB after the Guild had been certified by the Board. Copies of that letter were sent to John F. Cannon, counsel for Wells Fargo, and to Harry J. Martin, "President."

An additional item in support of Wells Fargo's contention that Harry Martin maintained his role in the Guild after his purported resignation emerges from the opinion of the Regional Director. In his opinion, the Regional Director referred to a proffer of testimony which Harry Martin would give to the effect that the letter written by the Guild about the relationship between the California union and Wells Fargo was mailed on or about April 10 or 12, 1979, considerably after the date Mr. Martin claimed to have resigned.

The Regional Director found that "what the Petitioner said about the resignation of Harry J. Martin and the establishment of the Board of Trustees was true." The only bases for these conclusions set forth in the opinion are the Regional Director's findings that Harry Martin had in fact resigned the presidency of the Guild and that the Guild

---

7. The Guild's assertion that the smear campaign succeeded in deterring some voters receives *prima facie* support from the fact that 120 guards voted in the first election (Harry Martin present) and 130 in the second (Harry Martin ostensibly absent).

The Board asserts in its brief that "the Union had never represented that Martin had severed all connection with the Union," and that "there was no evidence that the employees themselves were concerned about Martin's presence in the

Union; rather, it is clear that it was the Company that made an issue out of who was running the Union during the second election." NLRB brief at 23. Neither assertion is correct.

8. Because Mr. Martin did not send the mailgram until after the Guild had been certified, the Regional Director did not have the mailgram before him in deciding whether to hold an evidentiary hearing.

had "contacted" influential citizens. Those findings, however, are not determinative of the objections raised by Wells Fargo. Wells Fargo contends that Harry Martin remained in control. That he did not retain the title of president does not mean that he did not remain in control. An evidentiary hearing is required to ascertain whether he in fact remained in control. In addition, the finding that the Guild had "contacted" influential citizens does not answer Wells Fargo's contention that the Guild had falsely asserted that influential citizens had offered themselves to the Guild and that the board of influential citizens was in place.

The Regional Director's failure to conduct an evidentiary hearing on the issue of whether Mr. Martin maintained his ties with the Guild was erroneous. In *General Knit of California, Inc.*, 239 NLRB 619 (1978), the Board readopted the rule of *Hollywood Ceramics Co., Inc.*, 140 NLRB 221 (1962), pursuant to which an

> election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on election.

*General Knit*, 239 NLRB at 620, *quoting Hollywood Ceramics*, 140 NLRB at 224; footnote omitted. Under that rule, if Mr. Martin in fact remained in control of the Guild after his purported departure, the second election should be set aside. According to the Guild's own campaign literature, Mr. Martin's presence as a guiding force in the Guild was a campaign issue in the first campaign: Mr. Martin/Meehan severed his ties with the Guild in order to leave those who had been affected by the "smear campaign" free to vote for the Guild. If Mr. Martin in fact continued to guide the Guild, his purported resignation was a misrepresentation, a substantial departure from the truth, and might well have had a significant impact on the election, which was close. Wells Fargo, of course, had no opportunity prior to the election to respond to the misrepresentation effectively, since Mr. Martin did not resurface until after the election and only the Guild knew the truth.

*Objections 1 and 3 to the Second Election*

Wells Fargo also raised objections to the Guild characterization of the events which led to the setting aside of the first election as "foul play" and "unfair practices" on the part of Wells Fargo. However, it is undisputed that Wells Fargo had an opportunity to place its side of the story before the guards; indeed, Wells Fargo apparently explained the need for a second election to the guards before the Guild distributed the materials containing the characterizations to which Wells Fargo objects. In any event, as the Regional Director pointed out in his opinion certifying the Guild, Wells Fargo was in fact found guilty of conduct which required the setting aside of the first election.

Wells Fargo also objected to information disseminated by the Guild concerning the alleged relationship between Wells Fargo and the American Federation of Guards in California. For the reasons given by the Regional Director and set forth *supra*, this Court affirms the Board in overruling the objections of Wells Fargo to the Guild's analysis of the relationship between Wells Fargo and Desert Patrol.

*The First Election*

The Regional Director set aside the first election on the ground that Wells Fargo had distributed an altered facsimile ballot. In *Allied Electric Products, Inc.*, 109 NLRB 1270 (1954), the seminal NLRB opinion on facsimile ballots, the Board set an election aside where the union had distributed a sample Board ballot with the word "yes" printed to one side of the "yes" box, an "X" printed in the "yes" box, and an exhortation to place an X in the yes box printed on the bottom of the sample. In the course of its opinion, the Board wrote as follows:

> We find that the reproduction in this case by the Petitioner of altered copies of

the Board's official ballot tended to interfere with a free choice in the election, and was improper. We shall therefore set the election aside and order a new election. Upon consideration, the Board has decided that in the future it will not permit the reproduction of any document purporting to be a copy of the Board's official ballot, other than one completely unaltered in form and content and clearly marked sample on its face, and upon objection validly filed, will set aside the results of any election in which the successful party has violated this rule.

*Id.* at 1272; footnotes omitted.

■ This Court recently discussed the *Allied Electric* rule in *Monmouth Medical Center,* 604 F.2d at 825–27 & n.12, and noted that the rule against distribution of an altered sample ballot has been strictly applied by both the Board and the courts, on the ground that such distribution has a strong tendency to mislead. Thus, this Court will affirm the action of the Regional Director in setting aside the first election. This Court notes in passing, however, that the possibility that the facsimile ballot in this particular case *actually* misled anyone is small. Among other factors, the ballot was clearly marked as a sample and was reproduced on the distinctive blue and red Wells Fargo letterhead. Thus, in setting aside the first election the Board applied the *Allied Electric* rule at its most strict, an application warranted in part by the closeness of the election. *See Monmouth Medical Center,* 604 F.2d at 823 n.4.

The first election, however, was no closer than the second. In ruling that the first election must be set aside, the Board stretched the *Allied Electric* doctrine to its outer limits. In certifying the results of the second election, the Board adopted a flexible approach in its analysis of objections to the materials distributed by the Guild and possible misrepresentations therein. The strictness of the Board's action in

setting aside the first election, when contrasted with its flexibility in certifying the Guild after the second election, supplies a reason in addition to the ones discussed above for a remand of the case to the Board: the Board should have been as strict in examining possible Guild misrepresentations as it had been in examining Wells Fargo's alleged misconduct, particularly given that the margins of victory in the two elections were equally narrow.

In sum, this Court affirms the Board's decision to set aside the first election and the Board's overruling of Wells Fargo's first and third objections to the second election (concerning the California union and Guild allegations of "foul play"). This Court remands this case to the Board for an evidentiary hearing on Wells Fargo's second objection (the role of Harry J. Martin/Meehan).[9] The NLRB's cross-petition for enforcement of its order is denied.

---

9. New evidence on the 9(b)(3) issue may materialize during the hearing on Mr. Martin's role in the Guild or during the preparation for that hearing. This opinion should in no way be construed as precluding additional exploration of the 9(b)(3) issue by the Board if the need to do so arises.