774 F.2d 752
 120 L.R.R.M. (BNA) 2729, 54 USLW 2213,
103 Lab.Cas. P 11,578
 UNITED RETAIL WORKERS UNION LOCAL 881, chartered by United
Food and Commercial Workers International Union,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
May Department Stores Company, Venture Stores Division,
Intervenor-Respondent.
 No. 84-2000.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 16, 1985.
Decided Oct. 1, 1985.
 
 Marshal S. Berzon, Altshuler & Berzon, San Francisco, Cal., for petitioner.
 John Ferguson, Elliott Moore, Washington, D.C., for N.L.R.B. Francis X. Grossi, Jr., Chicago, Ill., for intervenor-respondent.
 Before BAUER and ESCHBACH, Circuit Judges, and PELL, Senior Circuit Judge.
 PELL, Senior Circuit Judge.
 
 
 1
 Petitioner, United Retail Workers Union Local 881, petitions this court to review an order of the National Labor Relations Board (the Board), which held that the employer, May Department Stores (the Employer) did not commit an unfair labor practice by refusing to bargain with petitioner. Petitioner is the entity created by a merger agreement between the United Retail Workers Union (URW) and the United Food and Commercial Workers International Union (UFCW). The Employer's refusal to bargain followed a vote by the URW members of the bargaining unit to merge with the UFCW. Bargaining unit employees who were not members of the URW could not vote in the merger election.
 
 
 2
 The issue on appeal is whether it was a permissible construction of the National Labor Relations Act (the Act) for the Board to hold that the Employer had no duty to bargain with the post-merger union because the URW had excluded from the merger vote those employees in the bargaining unit who were not members of the URW. The two federal courts of appeals that have addressed the Board's rule in the context of an affiliation election have split on the issue, compare Financial Institution Employees, Local No. 1182 v. N.L.R.B., 752 F.2d 356 (9th Cir.1984), cert. granted, --- U.S. ----, 105 S.Ct. 2318, 85 L.Ed.2d 838 (1985), with Local Union No. 4-14, Oil Workers International Union v. N.L.R.B., 721 F.2d 150 (5th Cir.1983), and, as noted, the Supreme Court has granted certiorari in one of the cases.
 
 I. THE FACTS
 
 3
 The parties are in complete agreement about the facts. Prior to November 1, 1982, the URW was a national independent union, with four local units and approximately 20,500 members. In total, the URW represented 22,400 employees of eleven different employers. In other words, just less than 2,000 of the represented employees were not union members. Two of the four local units consisted solely of stores owned by the Employer. The two locals represented 1,292 employees, of whom seventy-eight were not union members. The collective bargaining agreement between the URW and the Employer contained a union security clause; thus, all employees had to become union members within thirty-one days after their employment began.
 
 
 4
 Negotiations for a merger agreement between the URW and the UFCW began in 1981. According to the Agreement and Resolution of the two organizations, petitioner would retain the "United Retail Workers" name, manage its own finances, negotiate and ratify its own contract, elect its own officers, and continue its own special programs and benefits. At the same time, however, petitioner would be subject to the UFCW constitution. Furthermore, four non-independent administrative districts within petitioner's organization would replace the four local URW units, with election of officers on an at-large basis and not solely within each unit. All active URW members and all those who would finish their probationary period and apply for membership before the election date were eligible to vote in the election.
 
 
 5
 The URW then mailed to each member, but not to non-union employees, a copy of the merger agreement, a ballot, and a notice of meeting. A number of merger meetings occurred, from which the URW did not exclude non-union employees. The URW sent out 20,548 ballots. Of the 9,235 members who voted, 6,823 favored the merger, and 2,344 opposed it. The URW did not apportion the vote totals among the four local units. After the election, the URW and UFCW signed the merger agreement. In a letter, an officer of the URW informed the Employer that the post-election entity, although affiliated with the UCFW, would undergo no change in officers or organizational structure and would remain independent and autonomous with respect to collective bargaining, grievances, and arbitration. Petitioner would also maintain the URW's contract-ratification procedures.
 
 
 6
 Thereafter, the Employer refused to recognize petitioner and refused to abide by its collective bargaining agreement with the URW, which did not expire for nearly eighteen more months. The other employers of URW members did not take similar action. In withdrawing recognition, the Employer relied upon the URW's exclusion of nonmembers from the merger vote and the failure of the URW to provide unit-by-unit election results so that the Employer could ascertain whether a majority of its union employees favored the merger.
 
 
 7
 Petitioner then filed unfair labor practice charges against the Employer, alleging violations of sections 8(a)(5) and 8(a)(1) of the Act. 29 U.S.C. Sec. 158(a)(5) and (1). The Board held, in accord with its decision in Amoco Production Co., 262 N.L.R.B. 1240 (1982), see Part II, infra, that the exclusion of nonmembers from the election rendered the merger improper for lack of sufficient due process safeguards. May Department Stores Co., 268 N.L.R.B. 979 (1984). Therefore, the Board concluded that the Employer did not violate the Act by refusing to bargain with petitioner and by refusing to honor the existing contract.
 
 
 8
 Petitioner filed a timely appeal. Despite the fact that the present case involves a merger, petitioner does not attempt to escape the application of Amoco, which involved an affiliation, upon the basis of any factual distinction. Instead, petitioner maintains that two independent reasons mandate the rejection of Amoco. First, petitioner argues that the Board's already existing rule--that an employer need not bargain with a post-election union unless the union is merely a continuation of the old union with a new name and not a substantially different organization--adequately protects employees' representational interests. Thus, petitioner asserts the nonmember voting rule is "invalid as an entirely gratuitous interference with internal union affairs." Petitioner asserts that the merger is an internal union affair, effectively indistinguishable from other matters such as strike votes and contract ratifications, from which, the Board has held, unions may exclude nonmembers' participation.
 
 
 9
 Second, petitioner claims that, because the numerical outcome could not have changed even had all nonmember employees voted against the merger, the Board's own outcome determinative rule for Board-conducted representation elections should apply. Under the "outcome determinative" rule, mandated by the Landrum Griffin Act, 29 U.S.C. Sec. 482(c), the Board will not overturn a representation election unless it determines that an election without improprieties would have resulted in a different outcome. Petitioner maintains that the same rule should apply here because merger elections are, in a sense, substitutes for representation elections. Finally, petitioner claims that Amoco is internally inconsistent. Petitioner points out that the rule requires a union to allow all unit employees to vote in a merger election, just as in a representation election, because both types of elections implicate the same employee rights. Simultaneously, however, the Board refuses to apply the outcome determinative test to the merger context, somehow differentiating between merger elections and representation elections.
 
 
 10
 In contrast to petitioner's position, the Board contends that its Amoco rule is a permissible construction of the Act, consistent with the Act's fundamental guarantees. The Board maintains that the Amoco rule strikes a reasonable balance of the conflicting legitimate interests at stake. Therefore, in light of the broad deference due to the Board's determinations, the Board contends that we must deny the petition.
 
 II. THE HISTORY OF THE AMOCO RULE
 
 11
 In 1975, the Board, by a vote of two-to-one, adopted an administrative law judge's recommended order requiring Amoco Production Company to recognize and bargain with a union and to cease and desist from certain unfair labor practices. Amoco Production Co., 220 N.L.R.B. 861 (1975). The originally independent, Board-certified union voted to affiliate with an international. No non-union employees in the bargaining unit could vote in the election, although union organizers permitted them to participate in the discussions concerning the election and informed them that they could vote merely by becoming union members. Of the 480 employees in the unit, 383 received ballots. By a vote of 214-71, the employees voted in favor of affiliation. Thus, the margin of victory for the affiliation, 143 votes, was greater than the number of non-union employees who were ineligible to vote, of which there were ninety-seven. Nevertheless, the company refused to recognize petitioner and repudiated the collective bargaining agreement.
 
 
 12
 The Board held the company to its contract, relying upon the fact that participation by the non-union employees would not have altered the result. Id. at 864. The Board further noted that there was neither any procedural challenge to the manner in which the union ran the actual voting nor any employee complaints concerning the affiliation. Id. The Board found that the international was the successor to the independent and held that the change in affiliation did not relieve the company of its bargaining obligation. The Board also observed that, if it voided the merger election, the employees would have no union representation at all because the independent had ceased to exist after affiliation. Id. at 865.
 
 
 13
 The dissent maintained that the entire electoral process was fundamentally flawed because the "essence of democracy" is to give an opportunity to participate to all people affected by an electoral decision. Id. at 862 (Member Jenkins, dissenting). The dissent also rejected the majority's reliance upon the fact that there was an insufficient number of non-union employees to change the result of the election.
 
 
 14
 Exclusion of some of this electorate from the right to vote inhibits their participation in the electoral process, a participation which, through discussion and interchange of views may affect the attitudes and votes of others who are permitted to vote. Thus the effects of the exclusion cannot be measured by a mere numerical tally.
 
 
 15
 Id.
 
 
 16
 The company then appealed to the United States Court of Appeals for the Fifth Circuit. In the meantime, however, the Board changed its position with respect to affiliation elections and required unions to allow all unit members to vote before the Board would amend the union's certification as bargaining representative. Jasper Seating Co., 231 N.L.R.B. 1025 (1977). Consequently, the Board requested the Fifth Circuit to remand the Amoco case to the Board for further consideration. By a three-to-two vote, the Board then affirmed its earlier Amoco decision, reversing Jasper Seating Co. and holding, for two reasons, that an affiliation vote limited to union members does not relieve an employer from its duty to bargain with a certified union. Amoco Production Co., 239 N.L.R.B. 1195 (1979). First, the Board declared that an affiliation is basically an internal union affair. The Board stated that an affiliation "does not create a new organization, nor does it result in the dissolution of an already existing organization." Id. The Board also noted that there were a variety of reasons why an employee might favor affiliation and that only union members would be subject to any new constitution imposed by the new parent union. Id. at 1195 & n. 4. The Board emphasized that a decision to affiliate does not alter the existing collective bargaining agreement. Id. at 1195. Consequently, the Board concluded, affiliation election procedures are internal union matters over which the Board has no authority, provided that the election procedures otherwise satisfy basic due process requirements.
 
 
 17
 The second rationale for the Board's decision relied upon the fact that nonmembers sufficiently concerned about an affiliation election could simply join the union to participate in the vote. Id. In that respect, affiliations do not differ from other internal matters, such as strike votes, contract ratifications, and the election of union officers, stewards, and negotiators, in all of which cases the Board has allowed exclusion of nonmembers. The Board also identified the following facts as important: no employee complained about the election procedures or disputed the results; the bylaws, of which all employees were aware when deciding whether to join the union, explicitly limited the ability to vote to union employees; and, "while not dispositive of the issue, the 97 nonmembers could not have affected the overwhelming vote in favor of affiliation." Id.
 
 
 18
 In a concurring opinion, one member of the majority agreed with the result solely because he concluded that the question of affiliation "is a matter of exclusive concern to the union members ... so long as the union did not improperly deny membership to [any] employees." Id. at 1197 (Member Truesdale, concurring). Member Jenkins again dissented, maintaining that the exclusion of nonmembers established that the election "did not meet the minimum strictures of due process." Id. He also claimed that the majority's reliance upon the fact that interested employees could join the union if they wished to vote ignored the employees' section 7 right to refrain from union activity. Id. at 1198; 29 U.S.C. Sec. 157. Member Penello also dissented, but upon different grounds. He maintained that the affiliation of a 382-member independent with a 200,000-member international "resulted in a substantial change in the identity of the employees' bargaining representative." Id. This change raised a "question concerning representation," which only a Board-conducted election, open to all employees, could resolve. Id.
 
 
 19
 The company's subsequent appeal to the Fifth Circuit resulted in a further remand of the case to the Board. Amoco Production Co. v. N.L.R.B., 613 F.2d 107 (5th Cir.1980). The court noted that, under established precedent, the employer had no duty to bargain with the post-affiliation entity unless the entity was a valid successor to the independent union. Id. at 110. Successorship status turns upon whether the new entity is " 'a continuation of the old union under a new name or ... a substantially different organization?' " Id. at 112, quoting J. Ray McDermott & Co. v. N.L.R.B., 571 F.2d 850, 857 (5th Cir.1978), cert. denied, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238. The court then questioned the factual basis for the Board's conclusion, in its initial opinion, that there was a valid successorship established, id. at 110-11, and noted that the Board's second decision contained no discussion of the successorship issue, id. at 111. The court concluded that, because it could not determine why the Board had decided that the international was a successor union, the court would remand the decision to the Board to make a factual determination of successorship.
 
 
 20
 On remand for consideration of the successorship issue, the Board, instead, changed its position concerning the ability of a certified union to exclude nonmember employees from an affiliation election. The Board majority, in a three-to-two decision, labeled the exclusion issue a "threshold question ... for, if the affiliation election were improper, the question of successorship would be moot." Amoco Production Co., 262 N.L.R.B. 1240, 1241 (1982). The Board then determined that basic notions of due process required that affiliation elections be open to all employees, including nonmembers. Id. The Board reasoned that the question of affiliation is not a solely internal union matter because, after affiliation, the union will inevitably call upon the Board either to find an unfair labor practice if the employer refuses to bargain or to amend the union's certification. The concomitant invocation of Board processes requires the Board to assure that the election meets due process requirements. Id. The Board equated the affiliation decision with the initial certification process and declared that affiliation differs from such internal matters as strike votes and contract ratifications because only the affiliation decision "directly impacts upon matters within the breadth of the Act and results in an undermining of the Board's own election and certification procedures." Id. The Board asserted that the opportunity for the nonmember employees to join the union before the election did not satisfy due process because section 7 of the Act gives employees the right to refrain from union activities. Id. Finally, as to the argument that inclusion of all employees would not have changed the outcome, the Board repeated Member Jenkins' dissent from the first decision in the case: "the effects of the exclusion cannot be measured by a mere numerical tally." Id. n. 12. In conclusion, the Board declared that the employer did not commit any unfair labor practice by refusing to bargain with the post-affiliation union and held that due process requires that an affiliation election be open to all employees. Id. at 1241.
 
 
 21
 The two dissenters reasserted the rationales proffered in the first two Board decisions in the case. First, noting that it was the union's internal rule to require membership as a prerequisite to being able to vote in an affiliation election, the dissenters continued to maintain that such an election is an internal union matter in which the Board should not interfere. Id. at 1242 (Members Fanning and Zimmerman, dissenting). They also claimed that the matters previously recognized as internal, such as contract ratifications and strike votes, have at least as much impact upon nonmembers as an affiliation election, and yet the majority did not even question the exclusion of nonmembers in those situations. Id. The dissenters saw no tension between the exclusion of a nonmember and an employee's section 7 right to refrain from union activity: "If he has not joined, and was not unfairly barred from doing so, he is responsible for his own disenfrachisement." Id. If he has demonstrated no interest in internal union affairs by not joining, then the union should have no obligation to "solicit his views" concerning affiliation. Id. The dissenters maintained that the unionized employees are those most affected by an affiliation and that any effects upon nonmembers are indirect. They again noted that the outcome would not have changed had the nonmembers had the opportunity to vote. Id. at 1243 n. 21.
 
 
 22
 The Fifth Circuit affirmed the Board's order. Local Union No. 4-14, Oil Workers International Union v. N.L.R.B., 721 F.2d 150 (5th Cir.1983). Initially, the court acknowledged that " 'Congress has entrusted the Board with a wide degree of discretion in establishing the procedures and safeguards necessary to ensure the fair and free choice of bargaining representatives by employees.' " Id. at 153, quoting N.L.R.B. v. A.J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946). The court also remarked that the Board's collective experience could justify a change in its position. The court then noted the Board's prior vacillations on the issue and found "clearly articulated reasonable grounds" for the Board's new position. Id. The court concluded:
 
 
 23
 [W]e are unable to say that the general ruling that now requires the participation of nonunion members in an affiliation election is irrational or inconsistent with the Act, or that it is beyond the wide discretion of the Board to establish procedures in an affiliation election that will ensure the fair and free choice of the bargaining representative of all the employees.
 
 
 24
 Id. at 152-53.
 
 III. THE NINTH CIRCUIT DECISION
 
 25
 The United States Court of Appeals for the Ninth Circuit has held, in a two-to-one decision, that the Amoco rule is irrational and inconsistent with the Act. Financial Institution Employees, Local No. 1182 v. N.L.R.B., 752 F.2d 356 (9th Cir.1984) (F.I.E.), rehearing denied, 750 F.2d 757, cert. granted, --- U.S. ----, 105 S.Ct. 2318, 85 L.Ed.2d 838 (1985). In the F.I.E. case, an independent union sought affiliation with an international union, with the affiliation vote confined to union members. Only 2,624 of the 4,800 unit employees were union members. Of the union members, only 1,980 voted; 1,206 voted for affiliation and 774 voted against it. After finding continuity between the pre- and post-affiliation unions, the Board amended the union's certification. Seattle-First National Bank, 241 N.L.R.B. 751 (1979). When the employer then refused to bargain, the Board found the employer guilty of an unfair labor practice. Financial Institution Employees, 245 N.L.R.B. 700 (1979). After the Board adopted its new Amoco rule, however, it reversed itself in this case as well. Reasoning that the exclusion of nonmembers violates fundamental due process standards, the Board revoked the amended certification and dismissed the unfair labor practice charge against the employer. Seattle-First National Bank, 265 N.L.R.B. 426 (1982).
 
 
 26
 The Ninth Circuit reversed, noting that, prior to Amoco, the Board had undertaken two inquiries when examining affiliation elections. First, the Board had always required that unions conduct the elections with sufficient due process protections to ensure that the results accurately reflected the wishes of a majority of the union members. 752 F.2d at 360-61. The new rule now requires, as a threshold due process requirement, that all employees participate, thereby importing a consideration of the nonmembers' section 7 rights into the due process inquiry. Id. The second inquiry, not altered by Amoco, is whether there is a continuity of representation between the pre- and post-affiliation unions, an inquiry which addresses the section 7 interests of both members and nonmembers. Id. at 361. If continuity exists, then the Board has traditionally considered an affiliation to be an internal union affair. Id.
 
 
 27
 The court disapproved of the Amoco rule for three reasons. First, it held that the "rule violates a longstanding federal policy avoiding unnecessary interference in internal union affairs." Id. at 362. The court's reasoning on this issue was somewhat confusing. At the outset of its opinion, the court rejected the Board's assertion that affiliations are rarely simply internal matters, stating that some affiliations have such minimal effects upon nonmembers that they could be nothing but internal union affairs, while conceding that others have significant external effects upon nonmembers. Id. n. 9. The difference in effect usually depends upon the amount of authority ceded to the international, which is the subject of the continuity inquiry. Id. Nevertheless, because the continuity inquiry adequately protected nonmembers' rights, the court determined that "all affiliation decisions [are] internal union affairs." Id. The court conceded that the Board could interfere with internal matters if the questioned union rule "significantly impinges on a policy of the NLRA." Id. The court also conceded that the Board could interfere with internal matters if the questioned union rule "significantly impinges on a policy of the NLRA." Id. at 363. The court then concluded that the Amoco rule interferes with an internal union practice that impairs no statutory labor policy: "Under the new rule, by requiring a unit-wide vote even when continuity exists between a pre- and post-affiliation union, the Board inevitably interferes in internal union affairs without justification." Id. at 364.
 
 
 28
 Second, the court concluded that the new rule contravenes "the strong national policy of maintaining stability in the bargaining representative to achieve the NLRA's primary purpose preserving industrial peace." Id. The Board contrasted, for example, the Board's section 9(c) decertification procedures, under which the Board will not consider a decertification petition unless at least thirty percent of the employees sign the petition, 29 C.F.R. Sec. 101.18, with the new rule, which effectively decertifies the post-election union without any examination "into the character of the union or its support among employees." Id. at 365. The Amoco rule thus allows an employer to avoid a contract, without any indication that the union has lost its majority status, if the union affiliates without the participation of all employees.
 
 
 29
 Finally, the court held that the new rule is irrational for two reasons. First, the previous procedures adequately protect both all employees' rights to be represented only by an entity approved by a majority of the unit's employees and union members' rights to run internal affairs without outside interference. Id. at 366. The continuity requirement adequately protects nonmembers' section 7 rights, and, if a sizeable percentage of the employees become disenchanted, they retain the right to petition for decertification. Id. Second, the court determined that the Board's notions of "fundamental due process" for all employees does not support the new rule. Id. at 367. Previously, the due process inquiry only looked at the effect of voting procedures upon union members' rights to manage internal union affairs, while the continuity inquiry protected nonmembers' rights. Furthermore, the court maintained, the new rule is duplicative because, if the Board determines after an Amoco- imposed unit-wide election that there is a question of continuity raised by the affiliation, the Board would then conduct a formal unit-wide representation election. Id. Finally, the court found unpersuasive the Board's contention that, because affiliations usually result in amendments to certifications, the integrity of Board processes would be questioned without the new rule. The court "fail[ed] to see how imposing a non-Board-supervised election, even when no representation question arises, enhances the integrity of the Board's certification and election procedures." Id. (footnote omitted).
 
 
 30
 In dissent, Judge Wright found the new rule neither irrational nor inconsistent with the Act. Id. at 368 (Wright, J., dissenting). The judge relied upon the Fifth Circuit's opinion, a desire to avoid an "unwarranted" intercircuit conflict over the rationality of the Board's decision, and the broad deference due to the Board. Id. at 368-69. For similar reasons, six judges dissented from the subsequent denial of the employer's petition for rehearing with suggestion for rehearing en banc. Financial Institution Employees, Local No. 1182 v. N.L.R.B., 750 F.2d 757 (9th Cir.1984).
 
 
 31
 The Supreme Court has granted the separate petitions for certiorari filed by the Board, N.L.R.B. v. Financial Institution Employees, Local 1182, --- U.S. ----, 106 S.Ct. 28, 87 L.Ed.2d ----, (1985), and the employer, Seattle-First National Bank v. Financial Institution Employees, Local 1182, --- U.S. ----, 106 S.Ct. 28, 87 L.Ed.2d ----, (1985). Despite the Supreme Court's decision to grant certiorari, however, we have determined, for two reasons, to resolve the present dispute at this time. First, our decision might finally resolve this case should the parties seek no further review, thus making further delay unnecessary. Second, it is conceivable that the Supreme Court might not resolve the precise issue before us. Significantly, the question raised in the present case with respect to the Board's failure to impose an outcome determinative limitation upon the Amoco rule is wholly absent from the F.I.E. case. In the latter case, the number of employees excluded from the vote vastly exceeded the margin of victory by which the affiliation election carried. Thus, even if the Supreme Court were to agree with the Board's position in the F.I.E. case, we would still have to determine whether the Board's decision not to apply the outcome determinative test to affiliation elections is justifiable.
 
 
 32
 Finally, we note that the validity of the Amoco rule is also presently before the United States Court of Appeals for the District of Columbia Circuit. United Food and Commercial Workers International Union Local 568 v. N.L.R.B., petition for review docketed, No. 84-1243 (D.C.Cir. June 14, 1984) (reviewing F.W. Woolworth Co., 268 N.L.R.B. 805 (1984)).
 
 IV. THE INTERNAL UNION AFFAIR ISSUE
 
 33
 Petitioner contends that a merger election is an internal union affair. Traditionally, the Board, with court approval, has taken a deferential approach to internal union affairs, intervening only when a particular procedure does not meet "adequate due process standards." See, e.g., United Steelworkers v. Sadlowski, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982) (campaign contributions by nonmembers in election of union officers); N.L.R.B. v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973) (union discipline); Scofield v. N.L.R.B., 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969) (limits on piece work); N.L.R.B. v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967) (union discipline); Amoco Production Co., 262 N.L.R.B. at 1241 (Board distinguishes affiliations from strike votes, contract ratifications, and choice of contract negotiators, into which, the Board concedes, it normally would not intrude). In its Amoco decision, however, the Board determined that an affiliation election is not a solely internal union matter because of its impact upon the Board's certification process. We must determine whether the Board's characterization of affiliation and merger elections is sustainable.
 
 
 34
 Our appellate function in the present case is a narrow one. The Act confers upon the Board the authority to implement and interpret the Act. See N.L.R.B. v. Insurance Agents' International Union, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). Thus, as long as the Board's explication of a rule "is not inadequate, irrational or arbitrary," we must sustain its position. N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). As the Supreme Court has recently stated, in an analogous context, if the Act
 
 
 35
 has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 36
 ... Sometimes the legislative delegation [of authority] to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 37
 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies....' "
 
 
 38
 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) (footnotes omitted), quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).
 
 
 39
 The present case requires just such a reconciliation of conflicting statutory policies. The parties agree that the two fundamental labor policies involved are, first, stability in bargaining relations and industrial peace and, second, free choice and majority rule in the determination of a unit's bargaining agent. See N.L.R.B. v. Food Employers Council, Inc., 399 F.2d 501, 504 (9th Cir.1968). The act includes a number of provisions designed to limit labor strife and instability. E.g., Sec. 8(b)(7)(A), 29 U.S.C. Sec. 158(b)(7)(A) (prohibits recognitional picketing where unit employees already are represented by a recognized union); Sec. 8(b)(7)(B), 29 U.S.C. Sec. 158(b)(7)(B) (bars recognitional picketing for one year after a valid election); Sec. 9(c)(3), 29 U.S.C. Sec. 159(c)(3) (prohibits election in unit that has had an election within previous year). See generally N.L.R.B. v. A.J. Tower Co., 329 U.S. at 331, 67 S.Ct. at 328. The Board has adopted a number of other rules to achieve the same end. Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (Board may invest union with an irrebuttable presumption of majority status for one year after certification); Pioneer Inn Associates v. N.L.R.B., 578 F.2d 835, 838 (9th Cir.1978) (upholding "contract bar" rule that Board will not conduct decertification election during life of contract even if majority of employees withdraws support from union); 29 C.F.R. Sec. 101.18 (1984) (decertification petition requires support of at least thirty percent of employees). The Amoco rule implicates the stability policy by threatening to destroy an established bargaining relationship.
 
 
 40
 The interest in employee free choice of bargaining representatives is also one of the fundamental policies underlying the Act. For instance, section 7 states:
 
 
 41
 Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities....
 
 
 42
 29 U.S.C. Sec. 157 (emphasis added). Furthermore, section 9(a) of the Act provides:
 
 
 43
 Representatives designated or selected for the purposes of collective bargaining by a majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.
 
 
 44
 29 U.S.C. Sec. 159(a). The exclusive character of the bargaining representative requires the union to represent the interests of those employees who choose to exercise their section 7 right to refrain from union activities. N.L.R.B. v. Allis-Chalmers Manufacturing Co., 388 U.S. at 180, 87 S.Ct. at 2006. The impact of the Amoco rule upon the free choice interest is obvious.
 
 
 45
 An affiliation or merger election limited to union members presents particularly acute tensions between these conflicting policies. If the Board refuses to amend its certification or find an unfair labor practice should an employer refuse to bargain with the post-merger entity, it is most likely that the bargaining relationship will cease. On the other hand, if the Board permits the post-merger entity to represent all unit employees upon the basis of an exclusive election, a substantial possibility exists that a majority of the unit-wide work force would not favor that representation. To resolve the tensions presented by merger cases, the Board has resorted to a two-part test, as delineated above. First, the Board inquires whether the election procedures included adequate due process safeguards. Second, if the procedures are sufficient, the Board determines whether continuity exists between the pre- and post-merger organizations. The present case concerns only the first step of the Board's inquiry: As a matter of due process, Amoco requires a union to allow all employees in a bargaining unit to vote in the merger election.
 
 
 46
 Preliminarily, petitioner contends that, because the Amoco rule represents an allegedly sharp change of agency course, the agency "bears the burden of fully justifying the necessity for its shift in position." In support of its contention, the union cites Atchison, Topeka & Santa Fe Ry. v. Witchita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), in which the Court stated that an agency must clearly explain its departure from a "settled course of behavior." Id. at 807-08, 93 S.Ct. at 2374-2375. Yet, as the history of the Amoco case demonstrates, see Part II, supra, the Board's approach to the affiliation issue has been anything but settled. In an effort to resolve an unsettled area of its jurisprudence, the Board has now established its Amoco rule. As the United States Court of Appeals for the Ninth Circuit has stated, with reference to an area as fraught with indecision as is the affiliation issue, "the Board may alter its standards provided that its new rules are both rational and consistent with the Act." N.L.R.B. v. Best Products Co., 765 F.2d 903, 911 (9th Cir.1985). Thus, as long as the Amoco rule is rational and consistent with the Act, we will uphold it notwithstanding that the new rule resolves an unsettled area of union election law.
 
 
 47
 To comply with the limited review mandated by Chevron, see page 761, supra, we must give special deference to Board rules related to the choice of a bargaining representative: "as a matter of policy 'the soundness of an election rule is not the business of the reviewing court.' " N.L.R.B. v. Tom Wood Datsun, Inc., 767 F.2d 350, 352 (7th Cir.1985), quoting Mosey Manufacturing Co. v. N.L.R.B., 701 F.2d 610, 615 (7th Cir.1983) (en banc). Petitioner contends that the Amoco rule is not an election rule, but is, instead, an unwarranted intrusion by the Board into an internal union affair. Included in petitioner's contention, however, is a presupposition that a merger is an internal union affair. Yet, that is precisely the question presented by this petition. The Amoco rule that a merger is not a solely internal union affair represents a balancing of the stability and free choice interests. We must determine whether the Board's balancing of the interests and conclusion that mergers are not solely internal union affairs reflect a reasonable construction of the Act. Beth Israel Hospital v. N.L.R.B., 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978).
 
 
 48
 In Board-conducted representation elections, the Board has delineated a fairly elaborate set of procedures to be followed. In Amoco, the Board has merely redefined what it will consider to be adequate due process in the context of union-run merger elections. As a matter of internal union structure, a merger is virtually indistinguishable from other matters that the Board holds to be internal union affairs; a merger affects the relationship between a union and its members in such the same way as contract ratifications and elections of union officers. In one crucial aspect, however, a merger election differs from the other internal union affairs: Its effects are not limited to the relationship between a union and its members. Instead, it has external ramifications. For example, after an affiliation or merger, a union inevitably seeks an amendment to its certification, as in Amoco, or files unfair labor practice charges with the Board, as in the present case. Thus, because petitioner invoked the external authority of the Board in an attempt to establish that the employer had committed an unfair labor practice, the Board could rationally require an additional indicium of unit-wide majority support for the merger, while avoiding the imposition of the entire set of procedures required in a Board-conducted election. The additional indicium that Amoco requires is that all unit employees have the opportunity to vote.
 
 
 49
 We consider Amoco's limited procedural imposition upon the union's ability to conduct an election to be a rational balancing of the conflicting interests in stability and free choice. Furthermore, the imposition of the unit-wide eligibility requirement reconciles the union's dual status as a voluntary organization and as a certified or recognized bargaining agent. See R. Williams, NLRB Regulation of Union Bargaining Rights when Affiliation Changes 24 (U.Pa.1982). We do not suggest that Amoco is the only rational balance that the Board could have reached. The Board's pronouncements are not subject to such an exacting standard. We hold only that the Board's conclusion that a merger election is not a solely internal union affair is rational, consistent with the Act, and not arbitrary.
 
 
 50
 We decline to agree with the approach adopted by the Ninth Circuit in the F.I.E. case for much the same reasons that Judge Wright offered in his dissent from that opinion. The majority in F.I.E. set forth three reasons for rejecting Amoco. First, the rule unnecessarily interferes with internal union affairs. 752 F.2d at 362-64. As we have just concluded, however, we find that the Board's holding that a merger is not a solely internal union affair is rational and consistent with the Act. See id. at 368-69 (Wright, J., dissenting). Second, the Ninth Circuit found that the rule contradicted the policy of promoting stability in the bargaining representative. Id. at 364-66. Yet, as Judge Wright noted, Amoco will not increase instability because, "[u]nder the new rule, nonmembers may not force affiliation [or merger] because the decision to hold an affiliation election remains the province of the union. The Board's rule will promote stability more effectively than did its former position." Id. at 369 (Wright, J., dissenting). As we point out subsequently herein the firm establishment of Amoco rule, if followed by unions, might result in less post-merger litigation, and less industrial instability, than under prior Board approaches). Finally, the F.I.E. majority asserted that the new rule was irrational because previously followed procedures adequately protected all relevant interests. Id. at 366. On this issue, we find ourselves in complete agreement with Judge Wright: "The adequacy of the old procedure is irrelevant. We should instead determine whether the new rule is rational and consistent with the Act. The merit or sufficiency of the previous rule should not control." Id. at 369 (Wright, J., dissenting).
 
 
 51
 Because a merger election is not solely internal, the Board was free to pass upon the propriety of the election procedures followed by the union. Its determination that all unit members must vote before it will sanction the results of an affiliation election is a reasonable accommodation of the conflicting policies present in this case. Consequently, we must sustain the Board's action in this case, provided that we reject petitioner's next claim.
 
 V. THE OUTCOME DETERMINATIVE TEST
 
 52
 Petitioner claims that, even if we sustain the Board's universal suffrage requirement, we must reverse the Board's disposition of this case because of the failure of the Board to apply an outcome determinative limitation to the Amoco rule. Petitioner notes that, in Board-conducted representation elections, the Board will not overturn the election results unless the alleged errors in tabulation or voting procedures could have affected the outcome. See N.L.R.B. v. Speedway Petroleum, Division of Ermo Marketing Co., 768 F.2d 151, 154 (7th Cir.1985). Because a merger election is, in effect, a substitute for a representation election, which explains the Board's involvement in the regulation of merger elections, see Part IV, supra, petitioner asserts that the Board must apply the same outcome determinative test. Furthermore, petitioner claims that the Board failed to offer "any explanation of consequence" for refusing to apply the limitation.
 
 
 53
 Petitioner's final contention is clearly without merit. The Board did proffer a justification for its refusal to apply an outcome determinative limitation when it announced the Amoco rule. The justification was that "the effects of the exclusion cannot be measured by a mere numerical tally." 262 N.L.R.B. at 1241. Surely, this view is a rational assessment of the effects of a group exclusion upon the outcome of an election. With the knowledge that the union has forbidden them from voting, nonmembers have little incentive to air their views about the merits of a merger. Consequently, conflicting analyses of the proposed merger remain unarticulated. The resultant distortion of the election atmosphere easily could affect the votes of union members; exposure to conflicting views could either spur otherwise abstaining members to vote or convince voting union members to change their minds. Either way, the presentation of alternative opinions might lead union employees to adopt the viewpoints presented by non-union unit members and thus extend the influence of the non-union employees beyond their numerical representation within the bargaining unit. Although the contexts are different, we find that the pronouncements of the Supreme Court relative to group exclusions from jury service capture the manner in which group exclusions from an election can have effects greater than the mere number of excluded voters. See, e.g., Peters v. Kiff, 407 U.S. 493, 503-04, 92 S.Ct. 2163, 2168-69, 33 L.Ed.2d 83 (1972) (opinion of Marshall, J.) (exclusion of blacks for jury service "deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented"); Ballard v. United States, 329 U.S. 187, 193-94, 67 S.Ct. 261, 264, 91 L.Ed.2d 181 (1946) (exclusion of women from juries eliminates "the subtle interplay of influence" from the jury room).
 
 
 54
 Even apart from the effect of the exclusion of nonmembers upon the conduct of union employees, we hesitate to endorse the election of a union that has deliberately disenfranchised an entire group of otherwise eligible voters. Notions of participatory democracy lie at the very center of the Act, and full participation is impossible to achieve if entire segments of a given electorate do not receive the opportunity to vote. Consequently, we consider the Board's statement that "the effects of the exclusion cannot be measured by a mere numerical tally" to be an "explanation of consequence" for the rule.
 
 
 55
 Petitioner's argument that the fact that the Board applies an outcome determinative test to its own representation elections somehow renders irrational the Board's decision not to apply the same test to union-run merger elections is also without merit. Petitioner correctly asserts that the product of both a Board representation election and a union affiliation election is the same: to determine an exclusive bargaining representative. Yet, there is no logical reason why the Board must analyze the results of the two types of elections in an identical fashion, just as there is no requirement that the entity running the election must observe the same procedures. We have described above how the procedures required in an election depend upon whether the Board or the union runs the election. Rather than requiring unions to conform to all the procedural safeguards found in a Board-run election, the Board only requires that the union provide every employee an opportunity to register his or her opinion. It is not fatally inconsistent for the Board to apply different rules to fundamentally different procedures, even though the result of both procedures determines the exclusive bargaining agent for an employee unit.
 
 
 56
 Further, a significant, apples-oranges, distinction exists between the two types of elections. No group of employees within the appropriate unit is disenfranchised. Those who assert they are in the unit may cast a ballot even though it may be challenged. It is the challenged votes, nevertheless votes, which are not counted if their numbers would not be determinative of the outcome. The several distinctions between the two procedural mechanisms dispose of the contention that the Board must impose the same mode of analysis in both contexts.
 
 
 57
 According to petitioner, the independent union ceased to exist after the merger. Thus, the decision effectively to void the election would leave the employees without representation, at least temporarily. Petitioner complains about this "draconian" result. If the Board was correct, however, about its resolution of the internal union affairs issue, and we already have held that it was, then petitioner is to blame for not allowing the non-union employees to vote. Although a majority of the unit employees had agreed to representation by the independent, the independent no longer exists. Furthermore, the Board reasonably concluded that, because nonunion employees did not vote, no recognizable majority of the unit employees had agreed to representation by the post-election entity. Therefore, petitioner cannot invoke Board processes to force the Employer to bargain with it.
 
 
 58
 Two considerations deprive the allegedly draconian result of much of its sting. First, in the particular employment relationship at issue in the present case, nothing prevents petitioner from attempting to reorganize the Employer's work force. If petitioner succeeds in obtaining an indication of majority support, and the Employer refuses to recognize it, petitioner can compel a unit-wide, Board-conducted election, with binding results. Second, on a systemic level, the Amoco rule should result in a decrease in the amount of litigation on merger issues. Under Amoco, a union is certain to include all unit employees in a merger vote. If the vote carries, employers faced with certain majority support for the post-merger organization might be dissuaded from further contesting the validity of the merger.
 
 
 59
 It is on the systemic level that an outcome detemrinative limitation upon Amoco would divest the rule of its efficacy. If a union knew that it could disenfranchise nonmember employees and still have the results stand, provided the margin of victory was greater than the number of disenfranchised employees, there would be some incentive to continue to exclude nonmembers. If, on the other hand, the majority were not sufficiently large, there would have to be a unit-wide election, again run by the union. Even after such an election, if the question of the continuity of the post-merger union arose, a third election, this one conducted by the Board, would take place. The Board's refusal to impose an outcome determinative limitation eliminates the incentive for a union to gamble by disenfranchising the nonmember employees in the first instance. As such, the Board's refusal to limit Amoco rationally implements the fundamental NLRA policy of employee democracy.
 
 VI. CONCLUSION
 
 60
 We have considered all the arguments of petitioner and find them to be without merit. Accordingly, the petition for review is DENIED.